# Exhibit A

# MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement (this "***Agreement***"), dated as of November 8, 2019 (the "***Execution Date***"), is entered into by and among GQA HOLDINGS LLC, a Delaware limited liability company (the "***Buyer***"), International Energy Holding LLC, a Delaware limited liability company (the "***Acquired Company***"), the members of the Acquired Company signatory to this Agreement (the "***Sellers***"), Family Energy G.K., the Japanese subsidiary of the Acquired Company ("***Family Energy***"), Flower Power, Inc., an entity formed under the laws of Japan (the "***Parent***") and sometimes referred to as Flower Power Co. Ltd. ("***FP Japan***"), Palmco Administration, LLC, a New York limited liability Company ("***Palmco***") and Robert Palmese (as "***Sellers' Representative***"). The Buyer, Sellers, Acquired Company, Family Energy, FP Japan, Parent, Palmco and Sellers Representative are collectively referred to herein as the "***Parties***" and each is, individually, referred to as a "***Party***." For purposes of this Agreement references to Parent or to FP Japan shall be deemed to be references to Parent.

## RECITALS

A.     Seller owns all of the issued and outstanding shares of capital stock of Family Energy G.K. ("***Family Energy***"), an entity formed and existing under the laws of Japan.

B.     Parent and its affiliates own all of the issued and outstanding shares of capital stock of the Buyer, and FP Japan is an affiliate of Buyer and Parent, and a party to certain agreements with Family Energy pursuant to which FP Japan provides supply and collection services to Family Energy in Japan relating to the resale by Family Energy of electric service to consumers in Japan.

C.     Sellers are the owners of all of the issued and outstanding equity of the Acquired Company (the "***Membership Interests***").

D.     Parent, FP Japan and Buyer have reviewed the Electronic Data Room and the documents posted and information available thereon through the date of this Agreement and have had additional information available to them as a result of their involvement in the Japanese market and electric distribution and resale business, and FP Japan's contractual relationships with Family Energy and FP Japan's work with the Japanese regulatory authorities and Japanese power generation companies and transmission companies, including Tokyo Electric Power Company, and its Affiliates, successors and assigns.

E.     As of the Execution Date, FP Japan is holding Family Energy's and Acquired Company's monies in the aggregate amount of ¥181,778,111 (equivalent to $1,646,690.02), all of which has or will be deposited by FP Japan with the financial institution making working capital loans to FP Japan with such sum being security solely to support its purchase of electric for resale by the Acquired Company to its customers.

F.     Palmco has loaned to Family Energy $48,000 to cover Family Energy's payroll expenses for the week ending November 8, 2019 (the "**November Palmco Loan**")

NOW, THEREFORE, in consideration of the premises and mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

ARTICLE I.
DEFINITIONS AND CONSTRUCTION

Section 1.1.  Definitions.  As used herein, the following terms will have the following meanings:

"*Acquired Company*" has the meaning provided such term in the Preamble.

"*Adjustment Amount*" has the meaning provided such term in Exhibit A.

"*Affiliate*" means, with respect to a specified Person, any other Person, whether now in existence or hereafter created, directly or indirectly controlling, controlled by or under direct or indirect common control with such specified Person. For purposes of this definition and the definition of Subsidiary, "*control*" (including, with correlative meanings, "*controlling*," "*controlled by*" and "*under common control with*") means, with respect to a Person, the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through the ownership of equity interests, including voting securities, by contract or agency or otherwise.  For purposes of this Agreement, the Acquired Company and Family Energy shall be deemed not to be Affiliates of the Sellers following the Closing, and both the Acquired Company and Family Energy shall be deemed to be Affiliates of the Parent and of the Buyer following the Closing.

"*Agreement*" has the meaning provided such term in the Preamble.

"*Asserted Liability*" has the meaning provided such term in Section 10.5(a).

"*Assignment Agreement*" means the Assignment Agreement by and among the Sellers and the Buyer, effecting the sale and assignment by the Sellers to the Buyer of the Membership Interests, in substantially the form attached hereto as Exhibit B.

"*Balance*" has the meaning provided to such term in Section 2.2(a).

"*Balance Payment Date*" means the first day of the nineteenth month following Closing.

"*Benefit Plans*" means any "employee benefit plan", within the meaning of Section 3(3) of ERISA, and any bonus, deferred compensation, incentive compensation, stock and stock-based plan, program or arrangement.

"*BPA Procedures*" means the partnership audit procedures enacted under Section 1101 of the Bipartisan Budget Act of 2015.

"*Business Day*" means any day that is not a Saturday, Sunday or legal holiday in the State of New York and that is not otherwise a federal holiday in the United States or a day when

commercial banks are permitted or required to be closed for the regular transaction of business over their teller counters.

"***Buyer***" has the meaning provided such term in the Preamble.

"***Buyer Indemnified Parties***" has the meaning provided such term in <u>Section 10.2</u>.

"***Buyer Required Governmental Authorizations***" has the meaning provided such term in <u>Section 5.3(a)</u>.

"***Claim***" means any demand, claim, action, investigation or Legal Proceeding.

"***Claim Notice***" has the meaning provided such term in <u>Section 10.5(a)</u>.

"***Closing***" has the meaning provided such term in <u>Section 8.1</u>.

"***Closing Amount***" means $1,048,000

"***Closing Date***" has the meaning provided such term in <u>Section 8.1</u>.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Company Assets***" means the Acquired Company's ownership interest in Family Energy.

"***Company Business***" means the business of owning Family Energy and Family Energy's business as of the Execution Date.

"***Company Required Governmental Authorizations***" has the meaning provided such term in <u>Section 3.4(a)</u>.

"***Confidentiality Agreement***" means that certain Confidentiality Agreement, dated February 21, 2019, 2019, between International Energy Holdings LLC and Flower Power, Inc.

"***Contract***" means any agreement, lease, evidence of Indebtedness, mortgage, indenture, security agreement or other contract or legally binding agreement (whether written or oral).

"***Contracting Parties***" has the meaning provided such term in <u>Section 11.20</u>.

"***D&O Indemnified Persons***" has the meaning provided such term in <u>Section 6.13(a)</u>.

"***Direct Claim***" has the meaning provided such term in <u>Section 10.5(d)</u>.

"***Dollars***" and "***$***" mean the lawful currency of the United States.

"***Electronic Data Room***" means the Box.com data room containing Acquired Company and Family Energy documents as to which Buyer, Parent and FP Japan have had access.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended.

"**_ERISA Affiliate_**" means any entity that is considered a single employer with the Acquired Company under Sections 414(b), (c), (m) or (o) of the Code; *provided*, *however*, that an ERISA Affiliate of the Sellers shall not include any Person that is not a member of a parent-subsidiary group of trades or businesses that includes the Sellers.

"**_Execution Date_**" has the meaning provided such term in the Preamble.

"**_FP Japan_**" has the meaning provided such term in the Preamble.

"**_Family Energy Loan_**" means the ¥200,000,000 in principal amount of loans advanced or loaned to Family Energy by the Acquired Company from the proceeds of the Palmco Loans

"**_Fraud_**" means (i) a false representation of a material fact, (ii) made with knowledge or belief of its falsity, (iii) with the intent of inducing the other Person to act, or refrain from acting, and (iv) upon which the other Person acted or did not act in justifiable reliance on the representation, with resulting Losses, and which shall expressly exclude constructive fraud.

"**_Fundamental Representations_**" means the representations and warranties contained in Section 3.1 ("Due Organization; Qualification"), Section 3.2 ("Capitalization; Subsidiaries"), Section 3.4(b)(i) ("No Conflict"), Section 3.17 ("Brokers' Fees"), Section 4.1 ("Authority"), Section 4.2 ("Authorization; Enforceability"), Section 4.3(b)(i) ("No Conflict"), Section 4.4 ("Existence, Ownership and Subsidiaries"), Section 4.5 ("Legal Proceedings", Section 4.6 ("Brokers' Fees"), Section 4.7 ("Financial Matters"), Section 4.8 ("Taxes"), Section 5.1 ("Due Organization; Authority"), Section 5.2 ("Authorization; Enforceability"), Section 5.3(b)(i) ("No Conflict"), Section 5.4 (Investment Representation) Section 5.5 ("Brokers' Fees"), Section 5.7 ("Financial Ability") and Section 5.8 ("Solvency").

"**_GAAP_**" means generally accepted accounting principles of the United States, consistently applied.

"**_Governmental Authority_**" means any court, governmental department, commission, council, board, agency, bureau or other instrumentality of the United States, or any state, county, municipality or local governmental unit thereof, including any Taxing Authority.

"**_Governmental Authorization_**" means any franchise, permit, license, authorization, certificate, registration, plan, exemption, variance, decree, agreement, right or other consent or approval granted by, or subject to approval by, any Governmental Authority.

"**_Guaranteed Obligations_**" has the meaning provided such term in Section 6.7.

"**_ICDR_**" means the International Centre for Dispute Resolution

"**_ICDR Rules_**" means the ICDR International Dispute Resolution Procedures

"**_Income Taxes_**" means any income, franchise and similar Taxes.

"**_Indebtedness_**" means, with respect to any specified Person, any liabilities (contingent or otherwise) relating to (a) borrowed money indebtedness, including principal, interest and any

prepayment penalties, expenses, or fees thereon, created, issued, or incurred by such Person (whether or not evidenced by loan, note, bond, debenture, security or the issuance and sale of debt securities or the sale of property to another Person subject to a Contract); (b) reimbursement obligations and obligations with respect to letters of credit, bankers' acceptances, bank guarantees, surety bonds, and performance bonds, whether or not matured; (c) all obligations of such Person as lessee under leases that have been or should be, in accordance with GAAP, recorded as capital leases; (d) indebtedness secured by a lien on the property of such Person, whether or not the respective indebtedness so secured is a primary obligation of, or has been assumed by, such Person; and (e) indebtedness of others guaranteed by such Person (including guarantees in the form of an agreement to repurchase or reimburse, letters of credit and guarantees by the Acquired Company of performance obligations of another Person); *provided, however*, that Indebtedness will expressly exclude trade payables, purchase money security interests and other similar indebtedness incurred in the ordinary course of business.

"***Inspection Indemnitees***" has the meaning provided such term in Section 6.3(c).

"***Intellectual Property***" means the following intellectual property rights, both statutory and under common law, if applicable: (a) copyrights, registrations and applications for registration thereof, (b) trademarks, service marks, trade names, slogans, domain names, logos, trade dress, and registrations and applications for registrations thereof, (c) patents, as well as any reissued and reexamined patents and extensions corresponding to the patents, and any patent applications, as well as any related continuation, continuation in part and divisional applications and patents issuing therefrom and (d) trade secrets and confidential information, including ideas, designs, concepts, compilations of information, methods, techniques, procedures, processes and other know-how, whether or not patentable.

"***Knowledge***" means: (a) with respect to the Acquired Company and the Sellers, the actual present knowledge of Robert Palmese; (b) with respect to Buyer or Parent, the present actual knowledge of the natural Persons identified on Schedule 1.1(a).

"***Law***" means all applicable laws, statutes, rules, regulations, codes, ordinances, Governmental Authorizations, variances, Orders and licenses of a Governmental Authority having jurisdiction over the assets or the properties of any Party and the operations thereof.

"***Legal Proceeding***" means any judicial, administrative or arbitral action, suit, hearing, inquiry, investigation or other proceeding (public or private) before any Governmental Authority, arbitrator or arbitration authority.

"***Lien***" means any charge, pledge, option, mortgage, deed of trust, hypothecation, encumbrance or security interest.

"***Loss***" means any and all Claims, judgments, losses, liabilities, amounts paid in settlement, damages, fines, penalties, deficiencies and expenses (including reasonable fees of attorneys). For all purposes in this Agreement, the term "Losses" will not include any Non-Reimbursable Damages.

"***Material Adverse Effect***" means a change, effect, event or occurrence that, individually or in the aggregate with all other such changes, effects, events and occurrences, is materially

adverse to the properties, financial condition or results of operations of the Acquired Company, taken as a whole (calculated net of insurance proceeds) other than changes in the number of customers of Family Energy in the usual course of its business; *provided*, *however*, that in no event will any change, effect, event or occurrence that arises out of or relates to any of the following be deemed to constitute, or be taken into account in determining whether there has been, a Material Adverse Effect: (a) this Agreement or any actions taken in compliance with this Agreement (including any delay in connection with actions taken pursuant to Section 7.2), the transactions contemplated hereby, or the pendency or announcement thereof (including any loss of, or adverse change in, the relationship of the Acquired Company with its customers, partners, employees, financing sources, energy suppliers or other suppliers caused by the pendency or announcement of the transactions contemplated by this Agreement or the identity of Buyer or Parent), (b) changes or conditions affecting the industry in which the Acquired Company operates, (c) changes in general economic, capital markets, regulatory or political conditions in the United States or elsewhere (including interest rate fluctuations), (d) changes in Law, the Law in Japan, GAAP or regulatory accounting requirements or interpretations thereof, (e) fluctuations in currency exchange rates, (f) acts of war, insurrection, sabotage or terrorism (including cyberterrorism), the outbreak, engagement or escalation of hostilities involving the United States or Japan or any of their respective territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States or of Japan, the declaration by the United States or Japan of a national emergency or war, the occurrence of any natural disasters, disasters affecting the production of electrical power, or national or international political or social actions or conditions, including any crisis affecting public health, safety or welfare, (g) any act or omission to act by the Sellers or the Acquired Company contemplated by this Agreement or necessary to consummate the transactions contemplated hereby, or taken (or omitted to be taken) at the request of, or with the consent or waiver of, the Buyer or its Affiliates, (h) any act or omission to act by the Buyer or any of its Affiliates, (i) any failure of the Acquired Company or of Family Energy to meet any budgets, projections, forecasts or predictions of financial performance or estimates of revenue, earnings, cash flow or cash position, for any period, or (j) any matter set forth in the Schedules or in the Electronic Data Room.

"***Material Contracts***" has the meaning provided such term in Section 3.13(a).

"***Membership Interests***" has the meaning provided such term in the Recitals.

"***Nonparty Affiliate***" has the meaning provided such term in Section 11.20.

"***Non-Reimbursable Damages***" has the meaning provided such term in Section 10.6(c).

"***Order***" means any order, judgment, injunction, award, decree, writ or other legally enforceable requirement handed down, adopted or imposed by, including any consent decree, settlement agreement or similar written agreement with, any Governmental Authority.

"***Organizational Documents***" means any charters, articles of incorporation, certificates of incorporation, certificates of formation, articles of association, bylaws, operating agreements, certificates of limited partnership, partnership agreements, limited liability company agreements, regulations, and all other similar documents, instruments or certificates executed, adopted or

filed in connection with the creation, formation or organization of any Person, including any amendments thereto.

"***Outside Date***" means the date that is November 8, 2019.

"***Palmco***" mean Palmco Administration, LLC, a New York limited liability Company

"***Palmco Loans***" means the aggregate $10,048,000 loaned by Palmco, an affiliate of the Sellers to the Acquired Company (inclusive of the November Palmco Loan), of which the U.S. dollar equivalent of ¥181,778,111 is outstanding following the Closing.

"***Parent***" has the meaning provided such term in the Preamble.

"***Parent Guarantee***" has the meaning provided such term in <u>Section 6.7.</u>

"***Party***" or "***Parties***" has the meaning provided such term in the Preamble.

"***Permitted Liens***" means (a) statutory Liens for Taxes not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings, (b) mechanics', carriers', workers', repairers' and similar statutory Liens arising or incurred in the ordinary course of business, (c) public roads and highways, (d) Liens arising under worker's compensation, unemployment insurance, social security, retirement and similar legislation, (e) purchase money Liens and Liens securing rental payments under capital lease arrangements, (f) Liens and other rights reserved by or in favor of (i) any landlord under a real property lease or (ii) any grantor under the instrument creating or vesting title in and to any real property, (g) other Liens arising in the ordinary course of business and not incurred in connection with the incurrence of Indebtedness, (h) Liens, the existence of which have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) Liens contained in the Organizational Documents of the Acquired Company, (j) Liens created by the Buyer or its Affiliates, (k) Liens imposed by Law, (l) Liens securing obligations reflected as liabilities in the Electronic Data Room, (m) with respect to the real property, (i) zoning, entitlement, building and other land use regulations imposed by Governmental Authorities having jurisdiction over the real property and not violated by the current use and operation of the real property, (ii) covenants, conditions, restrictions, easements and other similar matters that would be disclosed by an inspection or accurate survey of any parcel of real property; *provided* that such covenants, conditions, restrictions, easements and other similar matters, individually and in the aggregate, do not impair in any material respect the occupancy, use or operation of any real property for purposes of the Company Business, (iii) all matters, both general and specific, that are disclosed (whether or not subsequently deleted or endorsed over) in any title policies insuring real property or any commitments therefor that have been made available to Buyer or obtained by or on behalf of Buyer, and (iv) any easement, encroachment, restriction, right-of-way and any other non-monetary title defect, whether or not of record; *provided* that, any such easements, encroachments, restrictions, rights-of-way and other non-monetary title defects, individually and in the aggregate, do not impair in any material respect the occupancy, use or operation of any real property for purposes of the Company Business, (n) the terms and conditions of the Material Contracts; (o) Liens that shall be released, waived or otherwise terminated in connection with the Closing, and (p) those matters identified on <u>Schedule 1.1(b).</u>

"***Person***" means any natural person, corporation, limited partnership, general partnership, limited liability company, joint stock company, joint venture, association, company, estate, trust, bank trust company, land trust, business trust, or other organization, whether or not a legal entity, custodian, trustee-executor, administrator, nominee or entity in a representative capacity and any Governmental Authority or political subdivision thereof.

"***Personal Property***" means the personal property interests owned by the Acquired Company and located on, over or across the Real Property, but specifically excluding the Real Property itself.

"***Plan***" means each employee Benefit Plan, equity purchase, equity option, severance, retention, employment, change-in-control, fringe benefit, collective bargaining, bonus, incentive, deferred compensation, employee loan and each other material employee benefit plan, agreement, program, policy or other arrangement sponsored, maintained or contributed to by the Acquired Company or any of its ERISA Affiliates under which the Acquired Company has any present liability.

"***Pre-Closing Period***" means any Tax period ending on or before the Closing Date.

"***Privileged Communications***" has the meaning provided such term in Section 11.19(c).

"***Pro Rata Percentage***" has the meaning provided such term in Section 2.3(e).

"***Property Taxes***" means ad valorem, property or similar Taxes (including any interest, fine, penalty or additions to tax imposed by any Taxing Authority in connection with such Taxes) based upon operation or ownership of the Company Assets.

"***Purchase Price***" has the meaning provided such term in Section 2.2.

"***Records***" has the meaning provided such term in Section 6.12.

"***Release***" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of Hazardous Substances into ambient air, surface water, groundwater or land, including land surface or sub-surface.

"***Representatives***" means a Person's directors, managers, general partner, officers, trustees, fiduciaries, employees, attorneys, consultants, financial advisers, agents or accountants.

"***Responsible Officer***" means, with respect to any Person, any vice-president or more senior officer of such Person.

"***Schedules***" means the schedules attached to this Agreement.

"***Schedule Supplement***" has the meaning provided such term in Section 6.16.

"***Seller***" and "***Sellers***" have the meanings provided such terms in the Preamble.

"***Seller Group***" has the meaning provided such term in Section 11.19(a).

"**_Seller Group Law Firm_**" has the meaning provided such term in <u>Section 11.19(a)</u>.

"**_Seller Taxes_**" means any and all Taxes imposed on the Acquired Company for any Pre-Closing Period and for the portion of any Straddle Period ending on the Closing Date (determined in accordance with <u>Section 6.8(c)</u>); *provided* that Seller Taxes will not include any Taxes (a) taken into account in the final determination of the Adjustment Amount, or (b) that result from any action taken on the Closing Date by, or at the direction of, the Buyer or outside the ordinary course of business.

"**_Sellers Representative_**" means Robert Palmese or his designee.

"**_Straddle Period_**" means any taxable period beginning on or before the Closing Date and ending after the Closing Date.

"**_Subsidiary_**" of a Person means any corporation or other legal entity of which such Person (either alone or through or together with any other Subsidiary or Subsidiaries) is the general partner or managing entity or of which at least a majority of the stock or other equity interests the holders of which are generally entitled to vote for the election of the board of directors or managers or others performing similar functions of such corporation or other legal entity is directly or indirectly owned or controlled by such Person (either alone or through or together with any other Subsidiary or Subsidiaries).

"**_Tax Proceeding_**" has the meaning provided such term in <u>Section 6.10</u>.

"**_Tax Refunds_**" has the meaning provided such term in <u>Section 6.9</u>.

"**_Tax Returns_**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**_Taxes_**" means any taxes and similar assessments imposed by any Taxing Authority, including income, profits, gross receipts, net proceeds, alternative or add-on minimum, ad valorem, value added, sales, use, real property, personal property (tangible and intangible), environmental, stamp, leasing, lease, user, excise, duty, franchise, transfer, registration, withholding, social security (or similar), unemployment, disability, payroll, employment, occupational, premium, severance, actual or estimated, or other similar charge, including any interest, penalty or addition thereto.

"**_Taxing Authority_**" means, with respect to any Tax, the Governmental Authority or political subdivision thereof that imposes such Tax, and the agency (if any) charged with the collection of such Tax for such entity or subdivision, including any governmental or quasi-governmental entity or agency that imposes, or is charged with collecting, social security or similar charges or premiums.

"**_Transaction Documents_**" means this Agreement, the Assignment Agreement, the Escrow Agreement, the Confidentiality Agreement and any other agreement or document that may be required to be executed to consummate the transactions contemplated hereby or thereby.

"**_Transfer Taxes_**" has the meaning provided such term in <u>Section 6.6</u>.

"**_Treasury Regulation_**" means the regulations promulgated by the United States Department of the Treasury pursuant to and in respect of provision of the Code. All references herein to sections of the Treasury Regulations shall include any corresponding provision or provisions of succeeding, similar, substitute, temporary or final Treasury Regulations.

Section 1.2.    <u>Rules of Construction.</u>

(a)    All article, section, subsection, schedules and exhibit references used in this Agreement are to articles, sections, subsections, schedules and exhibits to this Agreement unless otherwise specified. The recitals, exhibits and schedules attached to this Agreement constitute a part of this Agreement and are incorporated herein for all purposes.

(b)    If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb). Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa. The words "includes" or "including" shall mean "including without limitation," the words "hereof," "hereby," "herein," "hereunder" and similar terms in this Agreement shall refer to this Agreement as a whole and not any particular section or article in which such words appear and any reference to a Law shall include any rules and regulations promulgated thereunder, and any reference to any Law in this Agreement shall only be a reference to such Law as of the Execution Date. The word "or" is not exclusive. Currency amounts referenced herein are in U.S. Dollars. Terms defined in the singular have the corresponding meanings in the plural, and vice versa.

(c)    Time is of the essence in this Agreement. Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified. Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

(d)    All accounting terms used herein and not expressly defined herein shall have the meanings given to them under GAAP.

(e)    Each Party acknowledges that it and its attorneys have been given an equal opportunity to negotiate the terms and conditions of this Agreement and that any rule of construction to the effect that ambiguities are to be resolved against the drafting Party or any similar rule operating against the drafter of an agreement shall not be applicable to the construction or interpretation of this Agreement.

(f)    Unless otherwise indicated, with respect to the Sellers or the Acquired Company, the terms "**ordinary course of business**" or "**ordinary course**" shall be deemed to refer to the ordinary conduct of business in a manner consistent with the past practices and customs of the Sellers or the Acquired Company.

(g)     The phrase "made available" means that any of the Buyer, its Affiliates or its Representatives has had the opportunity prior to the Execution Date to review such documents or materials at the offices of the Acquired Company or its Representatives or electronically by virtue of the electronic data room established by the Acquired Company or its Representatives in connection with the transactions contemplated hereby or any other physical or electronic means provided by the Acquired Company.

ARTICLE II.
PURCHASE AND SALE

Section 2.1.     <u>Purchase and Sale of the Membership Interests</u>.  Upon the terms and subject to the conditions contained in this Agreement, at the Closing, the Sellers will sell, assign, transfer, convey and deliver to the Buyer, and the Buyer will purchase and accept from the Sellers, all of the Membership Interests in exchange for the consideration provided in <u>Section 2.2</u> below.

Section 2.2.     <u>Purchase Price and Repayment of Palmco Loan</u>.

(a)     Subject to the other terms and conditions of this Agreement, as full consideration for the sale, assignment, transfer and conveyance of the Membership Interests, the aggregate consideration (the "***Purchase Price***") to be paid by the Buyer to the Sellers is $1.00.

(b)     Payments in reduction of Loans,

(i)     Buyer shall pay to Palmco $1,047,999.00 in reduction of the Palmco Loans (leaving outstanding the U.S. dollar equivalent of ¥181,778,111), all of which payment shall be applied against principal.  Such payment shall be made by wire transfer of $1,000,000 concurrently with the execution of this Agreement with the balance being paid so that it is received by Palmco on or before 5:00 pm local New York time on November 14, 2019.

(ii)     Buyer, Acquired Company, Palmco and Sellers shall endeavor to provide to each other evidence of a duplicate transfer from Palmco to Family Energy of ¥12,200,000. Upon confirmation of such duplicate transfer, Buyer shall or it shall cause Family Energy to refund to Palmco such duplicate payment by wire transfer.  The parties agree that such confirmation is intended to occur prior to the close of business on Wednesday November 13, 2019, Tokyo Time and that the repayment shall be made so that it is received by Palmco on or before 5:00 local New York time on November 14, 2019.

(iii)     Palmco shall forgive and discharge all but $1,650,000 due from the Acquired Company to Palmco.

(c)     On April 30, 2021, Buyer shall pay in U. S. dollars, and Parent and FP Japan shall assure that Buyer has sufficient funds to pay to Palmco in U.S. dollars $1,646,690.02.  FP Japan grants a security interest to Palmco in the deposit referenced in Recital E to secure the payment due to Palmco on April 30, 2021.  If and only if the

entire payment required to be paid to Palmco under this Clause (c) is timely paid, then the balance of the Palmco Loans shall be forgiven.  If payment is not timely made, then interest at the rate of 12% per annum from the Execution Date shall be due and payable to Palmco together with all costs of suit, arbitrators' fees, ICDR fees, costs of collection, costs of enforcement and attorneys fees.

(d)     All sums remaining due on the Palmco Loans shall be cancelled upon the date that is 10 days following the payment to the Sellers and Palmco of all sums due to Palmco hereunder.

(e)     The Sellers, Acquired Company, Buyer and Parent acknowledge that Acquired Company has received the Palmco Loans and that the aggregate principal amount outstanding under the Palmco Loans is $1,650,000 on the Effective Date after giving effect to the payment to be made under Section 2.2(b) to Palmco.

(f)     Acquired Company agrees to repay, and Buyer, FP Japan and Parent each, jointly and severally agree to cause Acquired Company to repay and to provide sufficient funds for Acquired Company to repay the Palmco Loans to Palmco.

(g)     Payment made under this Section 2.2 towards the Palmco Loan shall be applied to the then outstanding principal of the respective loans, cost of collection, ICDR fees, arbitrator's fees, attorney's fees and other charges and expenses incurred by the Sellers in obtaining such payment, but in no event shall such payment exceed the amount of the Purchase Price.

Section 2.3.    Tax Classification; Purchase Price Allocation.

(a)     For federal income Tax purposes, the Parties agree to treat the transactions contemplated by this Agreement as a sale of partnership interests in a partnership through the direct sale of the Membership Interests by the Sellers to the Buyer.  The Parties agree not to voluntarily take any position on any Tax Return or in any administrative or judicial proceeding relating to the Tax reporting of the transactions under this Agreement that is inconsistent with this Section 2.3(a) for U.S. federal income Tax purposes or any state or municipal tax purpose.

(b)     In relation to the direct sale of Membership Interests pursuant to Section 2.3(a), the Parties agree that the Purchase Price and the liabilities of the Acquired Company (plus other relevant items) shall be allocated among the assets of the Acquired Company for all purposes (including Tax and financial accounting) as shown on the allocation schedule (the "***Allocation Schedule***") attached hereto as Schedule 2.3(b) for purposes of Section 751 of the Code and the statement required to be filed under Treasury Regulations Section 1.751-1(a)(3).  Each of the Parties agrees to (i) amend the Allocation Schedule to take into account any subsequent adjustments to the Purchase Price, in the manner consistent with the principles of the Code and the U.S. Treasury Regulations thereunder and (ii) report the transactions contemplated by this Agreement consistently with the Allocation Schedule, as adjusted by the Parties, on all applicable Tax Returns, and will not assert, and will cause its Affiliates not to assert, in connection

with any Tax Proceeding or other proceeding with respect to Taxes, any asset values or other items inconsistent with the amounts set forth on the Allocation Schedule, unless with the agreement of the other Party or otherwise required by Law or a "determination" within the meaning of Section 1313(a)(1) of the Code; *provided*, *however*, that nothing in this Agreement will prevent a Party from settling any proposed deficiency or adjustment by any Taxing Authority based upon or arising out of the allocation, and no Party will be required to litigate before any Governmental Authority any proposed deficiency or adjustment by any Taxing Authority challenging the allocation, as applicable. The Parties shall promptly advise each other regarding the existence of any Tax Proceeding related to the Allocation Schedule.

(c) The Acquired Company shall and Buyer and Sellers shall cause the Acquired Company to allocate all items of Acquired Company income, gain, loss, deduction, or credit attributable to the Membership Interests for the taxable year of the Closing based on a closing of the Acquired Company's books as of the Closing Date.

(d) Tax Audit Procedures. Buyer, Parent and Sellers shall request that the Acquired Company agree

 (i) not to elect into the partnership audit procedures enacted under Section 1101 of the Bipartisan Budget Act of 2015 (the "**BPA Procedures**") for any tax year beginning before January 1, 2018;

 (ii) to annually elect out of the BPA Procedures for tax years beginning on or after January 1, 2018 pursuant to Section 6221(b) of the Code;

 (iii) for any year in which applicable law and regulations do not permit the Acquired Company to elect out of the BBA Procedures and in which it receives a notice of final partnership adjustment, to timely elect the alternative procedure under Section 6226 of the Code, and

 (iv) for any year in which the Sellers or any of them are members of the Acquired Company, the Buyer, Parent and their successors shall not amend or agree to amend any federal or state tax return affecting the Acquired Company or any Japanese tax return that would affect how they are taxed, any income upon which they were taxed or any profit or loss for which they may be treated or taxed as a partner under federal or state tax law, unless, in each instance, the Sellers Representative has agreed to any such action.

(e) The Parties agree that each Seller's pro rata percentage of the total Purchase Price is 25% ("***Pro Rata Percentage***").

ARTICLE III.
REPRESENTATIONS AND WARRANTIES CONCERNING THE ACQUIRED COMPANY

Except as set forth in the Schedules, the Acquired Company represents and warrants to the Buyer as of the Execution Date (unless a specific date is set forth in such representation or

warranty, in which case such representation or warranty must be true and correct as of such specific date) as set forth below:

Section 3.1.     Due Organization; Qualification.

(a)     The Acquired Company is a limited liability company duly organized and validly existing under the Laws of the State of Delaware.  The Acquired Company has made available to the Buyer true and complete copies of the Organizational Documents of the Acquired Company.

(b)     The Acquired Company has the necessary limited liability company power and authority to own the equity interest in Family Energy owned by it on the date hereof and on the Closing Date and to carry on the Company Business as now conducted by the Acquired Company.  The Acquired Company is not qualified to do business as a foreign corporation in any jurisdiction.

Section 3.2.     Capitalization; Subsidiaries.

(a)     As of the Execution Date, the only equity interests issued and outstanding by the Acquired Company are the issued and outstanding limited liability company interests of the Acquired Company owned by the Sellers.  All of such Membership Interests have been validly issued and are or will be fully paid.  None of such limited liability company interests were issued in violation of the Organizational Documents of the Acquired Company. None of such Membership Interests are evidenced by a certificate issued by the Acquired Company.

(b)     Except for the purchase by the Buyer of the Membership Interests as provided in this Agreement, there are no outstanding

(i)     equity interests of the Acquired Company, including any preferred or convertible equity interests;

(ii)     options, warrants, purchase rights, subscription rights, preemptive rights, conversion rights, exchange rights, calls, puts, rights of first refusal, or other Contracts that may require the Acquired Company to issue, sell, or otherwise cause to become outstanding or to acquire, repurchase, or redeem, any securities of the Acquired Company (including any securities convertible into or exchangeable or exercisable for any equity interest of the Acquired Company); or

(iii)     profit participation, or similar rights with respect to the Acquired Company.

(c)     The Acquired Company does not own, directly or indirectly, any capital stock, equity interests or other securities of any Person other than its ownership of 100% of the equity of Family Energy.

Section 3.3.     Indebtedness.  Except for the loans made by Palmco to the Acquired Company, the Acquired Company has no outstanding Indebtedness (the "***Palmco Loans***").

Section 3.4.    No Conflict.

(a)    There are no Governmental Authorization of, or filing with, any Governmental Authority required on the part of the Acquired Company in connection with the execution and delivery of this Agreement by the Sellers and, as of the Closing, the other Transaction Documents by the Sellers or the Acquired Company or the consummation of the transactions contemplated hereby and thereby, except (i) filings, consents or approvals which, if not made or obtained, would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, and (ii) those customarily given or obtained post-closing for transactions of the type contemplated herein.

(b)    Assuming receipt of the Company Required Governmental Authorizations, the execution and delivery of this Agreement by the Sellers and, as of the Closing, the other Transaction Documents by the Sellers or the Acquired Company, and the consummation of the transactions contemplated hereunder and thereunder, will not result in (i) any conflict with the Organizational Documents of the Acquired Company, (ii) any breach or violation of or default under, or constitute or give rise to a termination or right of termination of any Material Contract, (iii) a violation of or default under any Law or Governmental Authorization to which the Acquired Company is subject, or (iv) the creation or imposition of any Lien (other than a Permitted Lien) on the Company Assets, except, in the case of each of the foregoing clauses (ii), (iii) and (iv) as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 3.5.    Legal Proceedings.  There is no Legal Proceeding pending or, to the Knowledge of the Acquired Company, threatened against the Acquired Company which (i) involves or affects the Acquired Company or Family Energy, or (ii) in any manner challenges or seeks the rescission of this Agreement or seeks to prevent, enjoin, alter, or materially delay the consummation of the transactions contemplated herein.

Section 3.6.    Financial Matters.  The Electronic Data Room contains unaudited financial statements and tax returns for the Acquired Company and for Family Energy which, to the Knowledge of the Acquired Company were taken from the books and records of such entities and which are highly dependent upon information provided by FP Japan and its Affiliates as to which no representation or warranty is made by the Acquired Company, Family Energy or the Sellers.  The financial statements and information contained therein have not been audited or reviewed by any independent accountants, and have not been compiled by any independent accountants.  The tax returns contained in the Electronic Data Room were prepared by management of such entities from the books and records of the Acquired Company and Family Energy from information contained therein which were highly dependent upon information provided by FP Japan and its Affiliates as to which no representation or warranty is made by the Acquired Company, Family Energy or the Sellers.  The parties recognize that the Acquired Company's and Family Energy's financial statements were prepared for management's general purposes and the representations in this paragraph and in Section 4.7 are based upon such premise.  Accordingly, the levels of materiality, estimates, judgments and assumptions made in connection therewith were made based upon the needs of management and general purpose

users.  Buyer, Parent and FP Japan recognize that their own needs may involve objectives not contemplated by the Acquired Company, Family Energy or the Sellers in the course of the preparation of the financial statements. None of the Acquired Company, Family Energy or any of the Sellers makes any representation as to the accuracy or completeness of any financial information contained in the financial statements or tax returns contained in the Electronic Data Room.

Section 3.7. <u>No Undisclosed Material Liabilities</u>. Since October 1, 2019, the Acquired Company has not incurred any obligation or liability of any type (whether accrued, absolute, contingent or otherwise) that would be required to be reflected on a balance sheet of the Acquired Company prepared in accordance with GAAP (without including any liability of Family Energy for such purpose), other than any such liabilities or obligations (a) incurred in the ordinary course of business, (b) as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 3.8. <u>Absence of Certain Changes</u>.  Except as contemplated by this Agreement, the activities of FP Japan and the Transaction Documents, during the period from October 1, 2019 to the Execution Date, (x) the Acquired Company has conducted the Company Business in the ordinary course in substantially the same manner in which it has been previously conducted and (y) without limiting the generality of the foregoing, the Acquired Company has not:

(a)     amended its Organizational Documents;

(b)     by repurchase, redemption or otherwise, acquired any equity interests from its equity holders or former equity holders;

(c)     issued, granted or sold any equity interests (or options or warrants) or any other securities or obligations convertible into or exchangeable for any of its equity interests;

(d)     mortgaged, pledged or subjected to any Lien (other than a Permitted Lien) or sold any of the material assets or properties of the Acquired Company, except in the ordinary course of business;

(e)     acquired by merger, consolidation or otherwise any material assets or business of any Person or other business organization or division thereof, except in the ordinary course of business;

(f)     changed in any material respect its accounting practices or principles except as required by GAAP;

(g)     suffered any damage, destruction, eminent domain taking, or other casualty loss (whether or not covered by insurance) affecting the Company Business, the Company Assets, or the Acquired Company in any material respect;

(h)     made any material increase or material alteration to the compensation paid or payable by the Acquired Company or any material alteration in the timing or method

of such payments, whether conditionally or otherwise, to any employee, other than in the ordinary course of business;

(i)     effected any issuance, sale, or other disposition of capital stock or other equity interests, or grant of any options, warrants, subscription rights, or other rights to purchase or obtain (including upon conversion, exchange, or exercise) any capital stock, partnership interests, limited liability company interests, or other equity interests of the Acquired Company;

(j)     effected any redemption, purchase, or acquisition of any capital stock, partnership interests, limited liability company interests, or other equity interests of the Acquired Company;

(k)     adopted any plan of reorganization, liquidation, or dissolution or filing of a petition in bankruptcy under any Law or consent to the filing of any bankruptcy petition against it under any Law;

(l)     agreed to the incurrence, assumption, or guarantee of any Indebtedness by the Acquired Company; or

(m)     entered into any Contract to do any of the foregoing.

Section 3.9.    <u>Real Property</u>. The Acquired Company neither owns nor leases any real property.

Section 3.10.    <u>Personal Property</u>.  The Acquired Company owns no Personal Property other than its interests in Family Energy.  The Acquired Company has good and valid title to all of the issued and outstanding capital stock of Family Energy, free and clear of all Liens, except for Permitted Liens.

Section 3.11.    <u>Governmental Authorizations; Compliance with Law</u>.  The Acquired Company holds all material Governmental Authorizations necessary for the conduct of its business owning Family Energy equity, (b) the Acquired Company is in material compliance with all such Governmental Authorizations held by the Acquired Company and Laws to which it or its Company Assets are subject and (c) the Acquired Company has not received written notification from any applicable Governmental Authority that it is not in material compliance with any Laws or any Orders to which it or its Company Assets are subject.

Section 3.12.    <u>Taxes</u>.

(a)     To Seller's Knowledge, the Acquired Company and Family Energy have filed all material Tax Returns required to be filed by them prior to October 31, 2019, when the same were due (taking into account any applicable extensions), the nonfiling or late filing of which would result in a Lien on the Membership Interests or the Company Assets or successor or transferee liability for the Buyer, and have timely paid in full all material Taxes shown to be due on such Tax Returns.  To Seller's Knowledge, no material audits or Legal Proceedings have been conducted or have been threatened, in writing, with respect to a material amount of Taxes of the Acquired Company or Family

Energy.  To Seller's Knowledge, there are no Liens for Taxes (other than Permitted Liens) upon any of the Company Assets.

(b)     To Seller's Knowledge, no written agreement or other document extending, or having the effect of extending, the period of assessment or collection of any Taxes payable by the Acquired Company has been executed or filed with the United States Internal Revenue Service or any other Taxing Authority that is currently in effect.  To Seller's Knowledge, no the Acquired Company is not the beneficiary of any extension of time (other than an automatic extension of time not requiring the consent of the United States Internal Revenue Service or any other Taxing Authority) within which to file any Tax Return not previously filed.

(c)     To Seller's Knowledge, the Acquired Company (i) is not a party to any Income Tax allocation or sharing agreement (other than agreements or arrangements not primarily related to Taxes), (ii) is not nor has it been a member of an affiliated group filing consolidated or combined Tax Returns (other than groups the common parent of which are or were the Sellers) or (iii) otherwise does not have any liability for the Taxes of any Person.

(d)     To Seller's Knowledge, all material Taxes required to be withheld, collected or deposited by or with respect to the Acquired Company, itself,  have been timely withheld, collected or deposited as the case may be, and to the extent required, have been paid to the relevant taxing authority.

(e)     To Seller's Knowledge, the Acquired Company is treated as a partnership for U.S. federal income tax purposes.

NOTWITHSTANDING ANY OF THE REPRESENTATIONS AND WARRANTIES CONTAINED ELSEWHERE IN THIS AGREEMENT, THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS SECTION 3.12 ARE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES RELATING TO TAX MATTERS, AND NO REPRESENTATION OR WARRANTY IS MADE CONCERNING THE EXISTENCE, AVAILABILITY, AMOUNT, USABILITY OR LIMITATIONS (OR LACK THEREOF) OF ANY NET OPERATING LOSS, NET OPERATING LOSS CARRYFORWARD, CAPITAL LOSS, CAPITAL LOSS CARRYFORWARD, BASIS AMOUNT OR ANY OTHER TAX ASSET OR ATTRIBUTE (WHETHER FEDERAL, STATE, LOCAL OR FOREIGN) OF THE ACQUIRED COMPANY AFTER THE CLOSING DATE.

Section 3.13.   Material Contracts.

(a)     The **Electronic Data Room** contains a list or a copy of each material contract known to the Sellers to which the Acquired Company is a party as of the Execution Date (the "***Material Contracts***").  No representation is made with respect to any contract executed or agreed to by FP Japan on behalf of or binding upon Family Energy or the Acquired Company and no such contract shall be deemed a Material Contract for purposes of this Agreement.

(b)     To Seller's Knowledge, each Material Contract is in full force and effect and constitutes a legal, valid and binding agreement of the Acquired Company, enforceable in accordance with its terms (subject to applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar Laws affecting the enforcement of creditors' rights generally or by general equitable principles).  To Seller's Knowledge, the Acquired Company has not received written notification that any of its Material Contracts is not in full force and effect, or that the Acquired Company or any other party thereto has breached its obligations thereunder, and, to the Knowledge of the Acquired Company, no event has occurred that (with or without notice or lapse of time) would reasonably be expected to result in a breach or violation of, or a default under, the terms of any Material Contract by the Acquired Company, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  To Seller's Knowledge, the Acquired Company has made available to the Buyer in the Electronic Data Room true and complete copies of all Material Contracts and Buyer acknowledges that it has received and reviewed the same and found them to be acceptable.

Section 3.14.  <u>Labor Matters</u>.  The Acquired Company has and since its formation has had no employees.  The Acquired Company is not bound by or subject to any Contract with any employee, manager, director, officer or labor union.

NOTWITHSTANDING ANY OF THE REPRESENTATIONS AND WARRANTIES CONTAINED ELSEWHERE IN THIS AGREEMENT, THE REPRESENTATIONS AND WARRANTIES IN THIS <u>SECTION 3.14</u> WILL BE THE ONLY REPRESENTATIONS AND WARRANTIES IN THIS AGREEMENT REGARDING ANY EMPLOYMENT MATTERS WITH RESPECT TO THE ACQUIRED COMPANY.

Section 3.15.  <u>Employee Benefit Plans.</u>  The Acquired Company has and since its formation has had no employee Benefit Plans.

Section 3.16.  <u>Related Party Transactions.</u>  Except with respect to any Organizational Document of the Acquired Company and the Palmco Loans, (a) none of the Sellers nor any of their Affiliates (other than the Acquired Company) nor any of their respective stockholders, officers, members or managers (i) is presently a party to any material agreement with the Acquired Company or (ii) owns any interest in any material assets of the Acquired Company and (b) no Acquired Company is a creditor of any of its directors, officers, managers or equity holders.

Section 3.17.  <u>Brokers' Fees</u>.  The Acquired Company will not be liable for any investment banking fee, finder's fee, brokerage payment or other like payment in connection with the origination, negotiation or consummation of the transactions contemplated herein that will be the obligation of Buyer or its Affiliates (including, following the Closing, the Acquired Company), and the Acquired Company is not a party to any agreement which might give rise to any valid claim against the Buyer or its Affiliates (including, following the Closing, the Acquired Company), for any such fee or payment.

Section 3.18.  <u>Books and Records</u>.  All books and records of the Acquired Company and the Company Business have been maintained in accordance with applicable Law in all material respects and in the ordinary course of business consistent with past practices of the Acquired Company and are materially complete and accurate other than as they may related to dealings with FP Japan and its Affiliates or any third party which FP Japan has dealt with on behalf of Family Energy, and, as to any or all of the foregoing no representation or warranty is made.

Section 3.19.  <u>Intellectual Property</u>.  As of the Execution Date, the Acquired Company neither owns nor licenses any Intellectual Property.

Section 3.20.  <u>Bank Accounts and Powers of Attorney</u>.  The Electronic Data Room sets forth information concerning complete list showing (a) the name and address of each bank in which the Acquired Company has an account or safe deposit box, the number of any such account or any such box and the names of all Persons authorized to draw thereon or to have access thereto and (b) the names of all Persons, if any, holding powers of attorney from the Acquired Company and a summary statement of the terms thereof.

ARTICLE IV.
REPRESENTATIONS AND WARRANTIES CONCERNING THE SELLERS

Except as set forth in the Schedules, the Sellers severally and not jointly hereby represent and warrant to the Buyer as of the Execution Date (unless a specific date is set forth in such representation or warranty, in which case such representation or warranty must be true and correct as of such specific date) as set forth below:

Section 4.1.  <u>Authority</u>.  The Seller is an individual who is a citizen of the United States and has all requisite power and authority, as applicable, to execute and deliver this Agreement and the other Transaction Documents to which he or she is or will be a party as of the Closing and to perform its obligations hereunder and thereunder.  Robert Palmese has been granted a power of attorney to execute this Agreement by each of the Sellers other than Robert Palmese, who is executing this Agreement on his own behalf and on behalf of the other Sellers.

Section 4.2.  <u>Authorization; Enforceability</u>.  This Agreement has been duly executed and delivered by the Seller or by Robert Palmese on the Seller's behalf under an executed power of attorney and constitutes, and, as of the Closing, each of the other Transaction Documents to which the Seller will be a party will be duly executed and delivered by the Seller, and will constitute, assuming the due authorization, execution and delivery of such Transaction Documents, as applicable, by the Buyer and the Parent, the valid and binding obligations of the Seller, enforceable against the Seller in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or other Laws relating to or affecting creditors' rights generally or by equitable principles (regardless of whether enforcement is sought at law or in equity).

Section 4.3.    No Conflict.

(a)    No Governmental Authorization of, or filing with, any Governmental Authority is required on the part of the Seller in connection with the execution and delivery of this Agreement and, as of the Closing, the other Transaction Documents by the Seller or the consummation of the transactions contemplated hereby and thereby, except (i) filings, consents or approvals which, if not made or obtained, would not, individually or in the aggregate, reasonably be expected to materially impede or delay the Closing or the ability of Seller to fulfill its obligations hereunder or under the other Transaction Documents to which it is or will be a party as of the Closing, (ii) those that may be required because of Buyer's participation in the transactions contemplated by this Agreement and the other Transaction Documents and (iii) those customarily given or obtained post-closing for transactions of the type contemplated herein.

(b)    The execution and delivery of this Agreement and, as of the Closing, the other Transaction Documents by the Seller and the performance by the Seller of his or her obligations hereunder and thereunder, will not result in (i) any breach or violation of or default under, or constitute or give rise to a termination or right of termination of, acceleration of any obligation or loss of any benefit under, any material Contract to which the Seller is a party, (ii) a violation of or default under any Law or Governmental Authorization to which the Seller is subject or (iii) the creation or imposition of any Lien, other than Permitted Liens on the Membership Interest owned by the Seller to be sold to the Buyer.

Section 4.4.    Existence, Ownership and Subsidiaries.  The Acquired Company is a duly formed and validly existing Delaware limited liability company and Family Energy is an existing company formed under the laws of Japan.  Each Seller is the sole record and beneficial owner of the Membership Interests to be sold to Buyer by such Seller under this Agreement and the Acquired Company is the sole record and beneficial owner of all of the equity interests issued by and outstanding with respect to Family Energy.  The Acquired Company has no subsidiaries other than Family Energy.  Family Energy has no subsidiaries.  The Sellers, as a group own all of the issued and outstanding Membership Interests of the Acquired Company and the Acquired Company owns all of the outstanding equity of Family Energy.  There are no outstanding

(a)    equity interests of the Acquired Company or of Family Energy, including any preferred or convertible equity interests other than as reflected in the preceding sentence;

(b)    options, warrants, purchase rights, subscription rights, preemptive rights, conversion rights, exchange rights, calls, puts, rights of first refusal, or other Contracts that may require the Acquired Company or Family Energy to issue, sell, or otherwise cause to become outstanding or to acquire, repurchase, or redeem, any securities of the Acquired Company or of Family Energy (including any securities convertible into or exchangeable or exercisable for any equity interest of the Acquired Company or of Family Energy); or

(c)     profit participation, or similar rights with respect to the Acquired Company or Family Energy.

Section 4.5.     <u>Legal Proceedings</u>. As of the Execution Date, (a) there is no Legal Proceeding pending or, to the Knowledge of the Seller, threatened against the Seller which in any manner challenges or seeks the rescission of this Agreement or seeks to prevent, enjoin, alter, or materially delay the consummation of the transactions contemplated herein and (b) there are no outstanding Orders imposed upon the Seller or the Membership Interests to be sold by Seller to Buyer.  As of the Execution Date, there are no Legal Proceedings against the Acquired Company or to Seller's Knowledge against Family Energy, or to Seller's Knowledge threatened against the Acquired Company or Family Energy.

Section 4.6.     <u>Brokers' Fees</u>. The Seller is not liable for any investment banking fee, finder's fee, brokerage payment or other like payment in connection with the origination, negotiation or consummation of the transactions contemplated herein that will be the obligation of Buyer or its Affiliates (including, following the Closing, the Acquired Company), and the Seller is not a party to any agreement which might give rise to any valid claim against the Buyer or its Affiliates (including, following the Closing, the Acquired Company), for any such fee or payment.

Section 4.7.     <u>Financial Matters.</u>  As of the Execution Date, the Acquired Company owes no monies to the Sellers or to Palmco other than as reflected in this Agreement or the Recitals to this Agreement.  As of the Effective Date, the Electronic Data Room contains unaudited financial statements and tax returns for the Acquired Company and for Family Energy which, to the Knowledge of the Sellers were taken from the books and records of such entities and which are highly dependent upon information provided by FP Japan and its Affiliates as to which no representation or warranty is made by the Acquired Company, Family Energy or the Sellers.  The financial statements and information contained therein have not been audited or reviewed by any independent accountants, and have not been compiled by any independent accountants.  The tax returns contained in the Electronic Data Room were prepared by management of such entities from the books and records of the Acquired Company and of Family Energy from information contained therein which were highly dependent upon information provided by FP Japan and its Affiliates as to which no representation or warranty is made by the Acquired Company, Family Energy or the Sellers.  The Parties recognize that the Acquired Company's and Family Energy's financial statements were prepared for management's general business purposes and the representations in this paragraph and in Section 3.6 are based upon such premise.  Accordingly, the levels of materiality, estimates, judgments and assumptions made in connection therewith were made based upon the needs of management and general purpose users.  Buyer, Parent and FP Japan recognize that their own needs may involve objectives not contemplated by the Acquired Company, Family Energy or the Sellers in the course of the preparation of the financial statements. None of the Acquired Company, Family Energy or any of the Sellers makes any representation as to the accuracy or completeness of any financial information contained in the financial statements or tax returns contained in the Electronic Data Room.

Section 4.8.     <u>Taxes</u>.

(a)     To Seller's Knowledge, the Acquired Company and Family Energy have filed all material Tax Returns required to be filed by them prior to October 31, 2019, when the same were due (taking into account any applicable extensions), the nonfiling or late filing of which would result in a Lien on the Membership Interests or the Company Assets or successor or transferee liability for the Buyer, and have timely paid in full all material Taxes shown to be due on such Tax Returns.  To Seller's Knowledge, no material audits or Legal Proceedings have been conducted or have been threatened, in writing, with respect to a material amount of Taxes of the Acquired Company or Family Energy.  To Seller's Knowledge, there are no Liens for Taxes (other than Permitted Liens) upon any of the Company Assets.

(b)     To Seller's Knowledge, no written agreement or other document extending, or having the effect of extending, the period of assessment or collection of any Taxes payable by the Acquired Company has been executed or filed with the United States Internal Revenue Service or any other Taxing Authority that is currently in effect. To Seller's Knowledge, no the Acquired Company is not the beneficiary of any extension of time (other than an automatic extension of time not requiring the consent of the United States Internal Revenue Service or any other Taxing Authority) within which to file any Tax Return not previously filed.

(c)     To Seller's Knowledge, no the Acquired Company (i) is not a party to any Income Tax allocation or sharing agreement (other than agreements or arrangements not primarily related to Taxes), (ii) is not nor has it been a member of an affiliated group filing consolidated or combined Tax Returns (other than groups the common parent of which are or were the Sellers) or (iii) otherwise does not have any liability for the Taxes of any Person.

(d)     To Seller's Knowledge, no all material Taxes required to be withheld, collected or deposited by or with respect to the Acquired Company, itself,  have been timely withheld, collected or deposited as the case may be, and to the extent required, have been paid to the relevant taxing authority.

(e)     To Seller's Knowledge, no the Acquired Company is treated as a partnership for U.S. federal income tax purposes.

NOTWITHSTANDING ANY OF THE REPRESENTATIONS AND WARRANTIES CONTAINED ELSEWHERE IN THIS AGREEMENT, THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS SECTION 3.12 ARE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES RELATING TO TAX MATTERS, AND NO REPRESENTATION OR WARRANTY IS MADE CONCERNING THE EXISTENCE, AVAILABILITY, AMOUNT, USABILITY OR LIMITATIONS (OR LACK THEREOF) OF ANY NET OPERATING LOSS, NET OPERATING LOSS CARRYFORWARD, CAPITAL LOSS, CAPITAL LOSS CARRYFORWARD, BASIS AMOUNT OR ANY OTHER TAX ASSET OR ATTRIBUTE (WHETHER FEDERAL, STATE, LOCAL OR FOREIGN) OF THE ACQUIRED COMPANY AFTER THE CLOSING DATE.

# ARTICLE V.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER, PARENT AND FP JAPAN

Except as set forth in the Schedules identified in this Article V, the Parent, FP Japan and the Buyer, jointly and severally, hereby represent and warrant to the Sellers and to the Sellers Representative as of the Execution Date (unless a specific date is set forth in such representation or warranty, in which case such representation or warranty must be true and correct as of such specific date) as set forth below:

Section 5.1.    Due Organization; Authority.  The Buyer and the Parent are Delaware limited liability companies, duly organized, validly existing and in good standing under the Laws of Delaware. FP Japan is a company organized, validly existing and in good standing under the laws of Japan.  The Buyer, Parent and FP Japan, each, have all requisite corporate or limited liability company power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is or will be a party as of the Closing and to perform its obligations hereunder and thereunder.

Section 5.2.    Authorization; Enforceability.

(a)    The execution, delivery and performance of this Agreement and each of the other Transaction Documents to which the Buyer, Parent or FP Japan are or will be a party, and the consummation of the transactions contemplated hereby and thereby, have been duly and validly authorized by Buyer.  As of the Closing, the execution, delivery and performance of the Transaction Documents to which Buyer, Parent or FP Japan will be a party will have been duly and validly authorized by such entities.

(b)    This Agreement has been duly executed and delivered by Buyer, Parent or FP Japan,  and constitutes, and, as of the Closing, each of the other Transaction Documents to which the Buyer, Parent or FP Japan will be a party will be duly executed and delivered by the Buyer, Parent or FP Japan, as the case may require, and will constitute, assuming the due authorization, execution and delivery of such Transaction Documents, as applicable, by the other Persons that are party thereto, the valid and binding obligations of the Buyer, Parent or FP Japan, enforceable against the Buyer, Parent or FP Japan in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or other Laws relating to or affecting creditors' rights generally or by equitable principles (regardless of whether enforcement is sought at law or in equity).

Section 5.3.    No Conflict.

(a)    Except for those set forth on Schedule 5.3(a) (collectively, the "**Buyer Required Governmental Authorizations**"), no Governmental Authorization of, or filing with, any Governmental Authority is required on the part of the Buyer, Parent or FP Japan in connection with the execution and delivery of this Agreement and, as of the Closing, the other Transaction Documents by the Buyer, Parent or FP Japan or the consummation of the transactions contemplated hereby and thereby, except (i) filings, consents or approvals which, if not made or obtained, would not, individually or in the aggregate, reasonably be expected to materially impede or delay the Closing or the ability of the Buyer, Parent or FP Japan to fulfill its obligations hereunder or under the other Transaction Documents to which it is or will be a party as of the Closing, (ii) those that may be required because of the Sellers' participation in the transactions contemplated by this Agreement and the other Transaction Documents and (iii) those customarily given or obtained post-closing for transactions of the type contemplated herein.

(b)    Except as set forth on Schedule 5.3(b) and assuming receipt of the Buyer Required Governmental Authorizations, the execution and delivery of this Agreement and, as of the Closing, the other Transaction Documents by the Buyer, Parent or FP Japan and the performance by the Buyer, Parent or FP Japan of their respective obligations hereunder and thereunder, will not result in (i) any conflict with the Organizational Documents of the Buyer, Parent or FP Japan, (ii) any breach or violation of or default under, or constitute or give rise to a termination or right of termination of, acceleration of any obligation or loss of any benefit under, any material Contract to which the Buyer, Parent or FP Japan is a party or by which the Buyer, Parent or FP Japan or any of their properties or assets are bound, (iii) a violation of or default under any Law or Governmental Authorization to which the Buyer, Parent or FP Japan is subject or (iv) the creation or imposition of any Lien, except, in the case of the foregoing clauses (ii), (iii) and (iv) as would not, individually or in the aggregate, reasonably be expected to materially impede or delay the Closing or the ability of the Buyer, Parent or FP Japan to fulfill its obligations hereunder or under the other Transaction Documents to which it is or will be a party as of the Closing.

Section 5.4.    Legal Proceedings.

(a)    There are no Legal Proceedings pending or, to the Buyer's Parent's or FP Japan's Knowledge, threatened that (i) challenge the validity or enforceability of the obligations of the Buyer under this Agreement or the respective obligations of the Buyer, Parent or FP Japan under the other Transaction Documents to which it is or will be a party or (ii) seek to prevent, delay or otherwise would reasonably be expected to adversely affect the consummation by the Buyer, Parent or FP Japan of the transactions contemplated herein or therein.

(b)    Except as set forth on Schedule 5.4(b), or as would not, individually or in the aggregate, reasonably be expected to adversely affect the consummation by the Buyer, Parent or FP Japan of the transactions contemplated herein or therein, there is no

Order issued or entered by any Governmental Authority imposed upon the Buyer, Parent or FP Japan.

Section 5.5.    Brokers' Fees.  Neither the Parent nor the Buyer or FP Japan is liable for any investment banking fee, finder's fee, brokerage payment or other like payment in connection with the origination, negotiation or consummation of the transactions contemplated herein that will be the obligation of the Sellers or their Affiliates, including any monitoring fees, financial services or similar fees payable to an Affiliate of the Parent, FP Japan or the Buyer.  None of the Parent, the Buyer or FP Japan is a party to any agreement which might give rise to any valid claim against the Sellers or their Affiliates for any such fee or payment.

Section 5.6.    Investment Representation.  The Parent and the Buyer are each an "accredited investor" as such term is defined in Rule 501 promulgated under the Securities Act of 1933, as amended.  The Buyer is acquiring the Membership Interests for its own account with the present intention of holding the Membership Interests for investment purposes and not with a view to, or for sale in connection with, any distribution. The Buyer has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of an investment in the Membership Interests to be acquired hereby.  The Parent and the Buyer acknowledge that the Membership Interests and have not been registered under federal and state securities Laws and that the Membership Interests may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of except in accordance with such Laws.

Section 5.7.    Financial Ability.  The Buyer now has, and as soon as all of the conditions to Closing set forth in Article 7 have been satisfied, will have, sufficient cash on hand or other immediately available funds to consummate the transactions contemplated by this Agreement and the Transaction Documents and satisfy all other costs and expenses arising in connection herewith and therewith and be able to provide for the working capital needs of the Acquired Company following the consummation of the transactions contemplated hereby.

Section 5.8.    Solvency.  None of the Buyer, Parent or FP Japan is not entering into the transactions contemplated by this Agreement with the actual intent to hinder, delay, or defraud either present or future creditors. At and immediately after the Closing, the Buyer, Parent and FP Japan  (a) will be solvent (in that both the fair value of its assets will not be less than the sum of its debts and the present fair saleable value of its assets will not be less than the amount required to pay its probable liability on its debts as they become absolute and matured), (b) will have adequate capital and liquidity with which to engage in its business and (c) will not have incurred and does not plan to incur debts beyond its ability to pay as they become absolute and matured.

Section 5.9.    Independent Investigation.  The Buyer and the Parent are informed and sophisticated buyers, and have engaged FP Japan and expert advisors, experienced in the evaluation and purchase of companies such as the purchase of the Acquired Company as contemplated hereunder.  The Buyer and the Parent have undertaken such investigation and have been provided with access to the Electronic Data Room, records of FP Japan and other information concerning the Acquired Company and Family Energy, FP Japan has serviced Family Energy in its business in Japan, and Buyer and Parent have evaluated such documents and information as they have deemed necessary to enable Buyer and Parent to make an informed and intelligent decision with respect to the execution, delivery and performance of this

Agreement and the transactions contemplated hereby. The Buyer and the Parent acknowledge that the Acquired Company and the Sellers have given the Buyer and the Parent such access to the key employees, documents and facilities of the Acquired Company and of Family Energy as the Buyer and the Parent, in their sole discretion, have determined to be necessary or desirable for purposes of the Buyer's evaluation, negotiation and implementation of the transactions contemplated hereby. The Buyer agrees that at the Closing, it shall accept the Membership Interests based upon the Buyer's, the Parent's and their respective Representatives' and advisors' own inspection, examination and determination with respect thereto as to all matters, and without reliance upon any express or implied representations or warranties of any nature, whether in writing, orally or otherwise, made by or on behalf of or imputed to the Sellers, except as expressly set forth in this Agreement.

ARTICLE VI.
COVENANTS

Section 6.1.    Covenants Regarding Conduct of the Acquired Company.  From the Execution Date through the earlier of the termination of this Agreement pursuant to Article 10 and the Closing, except as (1) permitted or required by the other terms of this Agreement or the Transaction Documents, (2) described on Schedule 6.1, (3) required by any Contract applicable to the Acquired Company or Family Energy, or (4) consented to or approved by the Buyer (which consent or approval will not be unreasonably withheld, conditioned, or delayed):

(a)    the Acquired Company shall, and it shall cause Family Energy to, conduct the Family Energy business in the ordinary course of business; and

(b)    the Acquired Company shall not:

(i)    amend its Organizational Documents in a manner which would reasonably be expected to adversely impact the Buyer;

(ii)    repurchase, redeem or otherwise acquire any equity interests from its equity holders;

(iii)    issue, grant or sell any equity interests (or options or warrants) or any other securities or obligations convertible into or exchangeable for any of its equity interests;

(iv)    excluding sales in the ordinary course of business, transfer, assign, sell or otherwise dispose of any of the material assets or properties of the Acquired Company or any interest in Family Energy, except pursuant to contractual obligations in place on the date of this Agreement;

(v)    mortgage, pledge or subject to any Lien (other than a Permitted Lien) any of the material assets or properties of the Acquired Company or Family Energy;

(vi)     acquire by merger, consolidation or otherwise any material assets or business of any corporation, partnership, association or other business organization or division thereof;

(vii)    change in any material respect its accounting practices or principles except as required by GAAP or Law; or

(viii)   agree to do any of the foregoing.

Notwithstanding the other provisions of this Section 6.1, from the Execution Date until the Closing, FP Energy, the Sellers and the Acquired Company may take commercially reasonable actions with respect to emergency situations; *provided* that (i) the Sellers or the Acquired Company must provide the Buyer with written notice of such taken actions by Sellers or the Acquired Company taken as soon as reasonably practicable, and (ii) FP Japan must provide the Sellers with written notice of such taken actions by FP Japan taken as soon as reasonably practicable . For purposes of clarification, nothing contained in this Section 6.1 is intended to give the Buyer, directly or indirectly, the right to control or direct the operations of the Acquired Company or Family Energy prior to the Closing.

Section 6.2.    Consents and Approvals.

(a)     Subject to the terms and conditions of this Agreement and except as otherwise expressly provided in this Agreement, each of the Parties (other than Palmco) will use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, and assist and cooperate with the other in doing, all things necessary, proper or advisable under Law or Order to consummate and make effective the transactions contemplated by this Agreement and the other Transaction Documents as promptly as practicable, including (i) preparing and filing as promptly as practicable with any Governmental Authority or other third party all documentation to effect all necessary, proper or advisable filings, notices, petitions, statements, registrations, submissions of information, applications and other documents and (ii) obtaining and maintaining all approvals, consents, registrations, permits, authorizations and other confirmations required to be obtained from any Governmental Authority or other third party that are necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement and the other Transaction Documents (whether or not such approvals, consents, registrations, permits, authorizations and other confirmations are conditions to the consummation of the transactions contemplated by this Agreement and the other Transaction Documents).

(b)     If any objections are asserted by any Governmental Authority or any other Person with respect to the transactions contemplated by this Agreement and the other Transaction Documents which would otherwise prevent, materially impede or materially delay the consummation of the transactions contemplated by this Agreement and the other Transaction Documents, or if any Legal Proceeding or action is instituted by any Governmental Authority or any other Person challenging any of the transactions contemplated by this Agreement or the other Transaction Documents as violative of Law, or an Order is issued temporarily or permanently enjoining any of the transactions

contemplated by this Agreement and the other Transaction Documents, the Parent and the Buyer shall, and shall cause each of their Affiliates to, use their commercially reasonable efforts to take any steps necessary to resolve any objections that a Governmental Authority may assert and to avoid or eliminate any legal impediment that may be asserted by any Governmental Authority or any other Party so as to enable the Parties hereto to close the transactions contemplated by this Agreement and the Transaction Documents as promptly as practicable, and in any event prior to the Outside Date.

(c)     Each of the Parties (other than Palmco) shall, or shall cause their respective counsel to, furnish the other Party with such necessary information and reasonable assistance as the other Party may reasonably request in connection with obtaining the necessary authorizations, approvals or consents as may reasonably be required in connection with the consummation of the transactions contemplated by this Agreement and the other Transaction Documents.

(d)     None of FP Japan, Buyer or Parent shall

(i)     participate independently in any meeting or communication with any Governmental Authority without first giving the other Parties (or the other Parties' outside counsel) an opportunity to attend and participate in such meeting or communication,

(ii)     give the other Parties reasonable advance notice of all oral communications with any Governmental Authority relating to obtaining the necessary authorizations, approvals or consents as may reasonably be required in connection with the consummation of the transactions contemplated by this Agreement and the other Transaction Documents,

(iii)     if any Governmental Authority initiates an oral communication regarding obtaining the necessary authorizations, approvals or consents as may reasonably be required in connection with the consummation of the transactions contemplated by this Agreement and the other Transaction Documents, provide an opportunity for the other Parties to participate in such communication to the extent practicable and, if such Parties cannot participate, promptly notify the other Parties of the substance of such communication, and

(iv)     provide each other with a reasonable advance opportunity to review and comment upon, and consider in good faith the views of the other in connection with, all written communications (including any analyses, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any Party relating to obtaining the necessary authorizations, approvals or consents as may reasonably be required in connection with the consummation of the transactions contemplated by this Agreement and the other Transaction Documents) with a Governmental Authority regarding obtaining the necessary authorizations, approvals or consents as may reasonably be required in connection with the consummation of the transactions contemplated by this Agreement and the other Transaction Documents.

Each Party (other than Palmco) shall be solely responsible for the final content of any substantive oral or written communications of such Party with any applicable Governmental Authority. The Parties (other than Palmco) shall jointly determine all tactics and strategies relating to their compliance with this Section 6.2.

Section 6.3.  Information, Access and Assistance.

(a)  From the Execution Date through the earlier of the termination of this Agreement pursuant to Article 10 and the Closing Date, upon receipt of reasonable advance notice and solely in furtherance of the Buyer's investigation of the Acquired Company, the Acquired Company will afford the Buyer and its authorized Representatives reasonable access during normal business hours to the offices, properties, books and records, and Representatives of the Acquired Company and of Family Energy who have significant responsibility in connection with the Company Business, and will furnish the Buyer with such additional information directly concerning the Acquired Company's and Family Energy's businesses, properties and personnel as may reasonably be requested by Buyer and its Representatives.

(i)  The Sellers shall have the right to have a Representative of the Sellers or their Affiliates present for any communication with the Acquired Company's Representatives or Family Energy's Representatives. The Buyer, FP Japan and the Parent shall, and they shall cause their Representatives to, observe and comply with all health, safety, security requirements and data protection and privacy requirements of the Acquired Company and the Sellers. For purposes of clarification and avoidance of doubt, the Sellers shall not be required to provide any information regarding any of their or their Affiliates' other business opportunities or operations which are not directly related to the current business and operations of the Acquired Company or Family Energy.

(ii)  None of the Parent, FP Japan or the Buyer shall have any right of access to, and the Acquired Company will not have any obligation to provide to either of them or to their Representatives

(a)  information relating to bids or offers received from or negotiated with others in connection with the transactions contemplated by this Agreement and information and analysis (including financial analysis) relating to such bids,

(b)  any information the disclosure of which would jeopardize any privilege available to the Acquired Company or Family Energy, the Sellers or any of their Affiliates,

(c)  any information that the disclosure of which would cause a breach of a confidentiality obligation by the Acquired Company, Family Energy, the Sellers or any of their Affiliates, or

(d)  any information, the disclosure of which would result in a violation of Law.

(iii) Without the prior written consent of the Acquired Company, neither the Parent nor the Buyer shall contact any suppliers to, or customers of, the Acquired Company or of Family Energy with respect to the transactions contemplated hereby.

(iv) All information obtained pursuant to this <u>Section 7.3</u> shall constitute "Confidential Information" as such term is used in the Confidentiality Agreement and shall be subject to the protections, limitations, remedies and other terms thereof with the Acquired Company and Family Energy being bound to the same extent as the Acquired Company is bound thereby and with the Buyer, Parent and FP Japan being bound to the same extent as Flower Power, Inc. is bound thereby.

(b) Any inspection or investigation conducted by the Buyer, Parent or FP Japan or their Representatives prior to the Closing shall be conducted in accordance with applicable Law, including data protection and privacy laws, and in such manner as not to interfere unreasonably with the business or operations of the Acquired Company or of Family Energy. Neither the Sellers, the Acquired Company nor any of their Affiliates makes any representation or warranty as to the accuracy of any information (if any) provided pursuant to this <u>Section 6.3</u>, and none of Parent, FP Japan or Buyer may rely on the accuracy of any such information, in each case other than as expressly set forth in the representations and warranties contained in <u>Article 3</u>, <u>Article 4</u>, <u>Article 5</u> and the Transaction Documents. Notwithstanding any provision to the contrary contained in this Agreement, the provisions of this <u>Section 6.3(b)</u> will survive the termination of this Agreement and the Closing.

(c) If the Buyer, FP Japan or Parent exercises rights of access under this <u>Section 6.3</u> or otherwise, or conducts examinations or inspections under this <u>Section 6.3</u> or otherwise, then (i) such access, examination and inspection will be at the Buyer's, Parent's and FP Japan's sole risk, cost and expense and each of them waives and releases all Claims against the Sellers, the Acquired Company, each of their respective Affiliates and each of their respective employees, directors, managers, officers, attorneys, contractors and agents (collectively, the "***Inspection Indemnitees***") arising in any way therefrom or in any way related thereto or arising in connection with the conduct of the Inspection Indemnitees and (ii) the Buyer, Parent and FP Japan will indemnify, defend and hold harmless the Inspection Indemnitees from and against any and all Claims or Losses of any kind or character arising out of this <u>Section 6.3(c)</u>. **THE FOREGOING RELEASE AND INDEMNIFICATION WILL APPLY WHETHER OR NOT SUCH CLAIMS OR LOSSES ARISE OUT OF (A) NEGLIGENCE (INCLUDING SOLE NEGLIGENCE, SIMPLE NEGLIGENCE, CONCURRENT NEGLIGENCE, ACTIVE OR PASSIVE NEGLIGENCE, BUT EXCLUDING GROSS NEGLIGENCE OR KNOWING AND INTENTIONAL MISCONDUCT) OF THE SELLERS OR THEIR AFFILIATES OR (B) STRICT LIABILITY.** Notwithstanding any provision to the contrary contained in this Agreement, the provisions of this <u>Section 6.3(c)</u> will survive the termination of this Agreement and the Closing.

Section 6.4.    Public Announcements.  The Parties agree that, except to the extent necessary to comply with the requirements of Law, no press release or similar public announcement or communication will ever, whether prior to or subsequent to the Closing, be made or caused to be made concerning the existence or subject matter of this Agreement unless approved in advance by the Parties in writing.  If a Party desires to make an announcement to the general public, it shall first give the other Party not less than three full Business Days' prior written notification of its desire to make such a public announcement. The written notification shall include (i) a request for consent to make the announcement (which consent shall not be unreasonably withheld, conditioned or delayed), and (ii) a written draft of the text of such public announcement.  Notwithstanding any provision to the contrary contained in this Agreement, the provisions of this Section 6.4 will survive the termination of this Agreement and the Closing.

Section 6.5.    Commercially Reasonable Efforts.  Subject to the terms and conditions of this Agreement and except as otherwise expressly provided in this Agreement, each of the Parties will use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable to consummate the transactions contemplated by this Agreement and the other Transaction Documents and to ensure the satisfaction of its conditions to Closing set forth herein.  However, Palmco shall have no obligation to cause Sellers, the Acquired Company, Family Energy or any other Person to take any action under this Section 6.5.

Section 6.6.    Transfer Taxes.  The transactions contemplated by this Agreement involve the transfer of the Membership Interests, which are intangible assets.  Accordingly, the Parties do not expect any state and local transfer, sales, use, stamp, registration or other similar Taxes to arise by reason of the consummation of the transactions contemplated by this Agreement ("*Transfer Taxes*").  To the extent that any Transfer Taxes are assessed, such Transfer Taxes will be borne by the Buyer. The Parties will cooperate in good faith to minimize, to the extent permissible under Law, the amount of any Transfer Taxes.

Section 6.7.    Parent and FP Energy Guarantee.  Parent and FP Japan, jointly and severally, hereby irrevocably, absolutely, fully and unconditionally guarantee (the "*Parent Guarantee*") to the Sellers, Palmco, the Sellers Representative and their respective heirs, personal representatives, successors and permitted assigns the prompt and complete performance and payment when and as due of all obligations, including payment obligations, of the Buyer and of the Acquired Company hereunder (the "*Guaranteed Obligations*").  Parent and FP Japan, each, agrees that the Parent Guarantee is a primary obligation of Parent and of FP Japan and that the Sellers, Palmco and Sellers Representative may enforce the Parent Guarantee without the necessity at any time of resorting to or exhausting any other security or collateral. This is a guarantee of payment when and as due and not merely of collection. Parent and FP Japan, each, agrees that the guarantee set forth in this Section 6.7 shall not be discharged or deemed to have been discharged except by the complete and irrevocable performance of all Guaranteed Obligations. Parent and FP Japan, each understands and agrees that the Parent Guarantee shall be a continuing guarantee, irrespective of any circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor. Parent and FP Japan, each hereby expressly waives diligence, presentment, protest and all notices whatsoever and any requirement that the Sellers or the Sellers Representative exhaust any right, power or remedy or proceed against the Buyer or any other guarantor under this Agreement or any other agreement

or instrument referred to herein or therein. Without limiting Parent's own defenses and rights hereunder, Parent reserves to itself all rights, setoffs, counterclaims and other defenses that the Buyer may have to payment of all or any portion of the Guaranteed Obligations except any legal or equitable discharge or defense arising from bankruptcy, insolvency, dissolution or liquidation of the Buyer.

Section 6.8.    <u>Tax</u>.

(a)    The Sellers shall prepare (or cause to be prepared) all Tax Returns with respect to the Acquired Company required to be filed after the Closing Date for any Pre-Closing Period on a basis consistent with past practice, except to the extent otherwise required by Law. The Sellers will cause such Tax Return to be timely filed, all Schedules K-1 to be provided and delivered to the Sellers and the payment of Taxes timely paid to the appropriate Taxing Authority.

(b)    The Buyer shall prepare (or cause to be prepared) all Tax Returns with respect to Family Energy required to be filed after the Closing Date for any period prior to the Closing and with respect to the Acquired Company and Family Energy required to be filed after the Closing Date for any Straddle Period on a basis consistent with past practice, except to the extent otherwise required by Law. Reasonably in advance of filing any such Tax Return (which in the case of a Tax Return that relates to Income Taxes, shall not be later than 30 days prior to such filing), the Buyer shall deliver a copy of such Tax Return, together with all supporting documentation and work papers, to the Sellers for their review and reasonable comment.  After receipt and consideration of such revisions and comments as Sellers or their advisors may recommend or submit, the Buyer shall cause each such Tax Return to be filed timely and payment of Taxes to be timely paid with the appropriate Taxing Authority and will provide a copy thereof to the Sellers. Not later than five days prior to the due date for the payment of Taxes with respect to each Tax Return for a Straddle Period, the Sellers shall pay to (or at the direction of) the Parent each of their respective portion of the amount of any Seller Taxes with respect to such Tax Return that are paid or payable by the Acquired Company pursuant to Law.

(c)    For purposes of determining Seller Taxes with respect to any Straddle Period of the Acquired Company, the portion of any Tax for such Straddle Period that is attributable to the portion of such Straddle Period ending on the Closing Date shall be with respect to Taxes that are (A) Income Taxes, (B) imposed in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible) or (C) imposed on specific transactions, including payroll Taxes, deemed equal to the amount that would be payable if the Tax year of the Acquired Company ended on the Closing Date; *provided*, that all exemptions, allowances, or deductions for the Straddle Period which are calculated on an annual basis (including depreciation and amortization deductions) shall be allocated in proportion to the number of days in such period prior to and including the Closing Date; and

(d)    Except as required by applicable Law, neither the Buyer nor any of its Affiliates shall amend any Tax Return of the Acquired Company for a Pre-Closing Period or Straddle Period, or make any election (including any elective entity classification

election under Treasury Regulation § 301.7701-3) with respect to the Acquired Company or Family Energy that has or would have a retroactive effect to any Pre-Closing Period or Straddle Period, without the prior written consent of the Sellers or the Sellers Representative in each instance.

Section 6.9.    Tax Refunds.  Any refunds or credit of Taxes of the Acquired Company (other than any refund resulting from the carryback of a net operating loss or other Tax attribute from a period beginning after the Closing Date to a period ending on or prior to the Closing Date, which refund shall be for the account of the Buyer) (whether in the form of cash received or a credit or offset actually realized against Taxes otherwise payable), to the extent not already included in the Adjustment Amount ("***Tax Refunds***") for any Pre-Closing Period or, with respect to any Straddle Period, the portion of such Straddle Period ending on the Closing Date shall be for the account of the Sellers.  Any Tax Refunds for any Tax period beginning after the Closing Date shall be for the account of the Buyer.  Any Tax Refunds for any Straddle Period shall be equitably apportioned between the Sellers, as applicable, and the Buyer in accordance with the principles provided for in Section 6.8(c).  To the extent that the Buyer or any of its Subsidiaries receives a Tax Refund that is for the account of the Seller pursuant to this Section 6.9, the Buyer shall pay or cause to be paid the amount of such Tax Refund (and any interest received from the Governmental Authority) to the Sellers, as applicable.  The amount due to the Sellers under this Section 6.9 shall be paid to the Sellers within thirty (30) days following the receipt of the Tax Refund from the applicable Governmental Authority (or, if the Tax Refund is in the form of a credit or offset against Taxes otherwise payable, within thirty (30) days after the due date of the Tax Return claiming such credit or offset).

Section 6.10.    Cooperation on Tax Returns and Tax Proceedings.  Each Party will cooperate fully as and to the extent reasonably requested by another other Party, in connection with the filing of Tax Returns and any audit, litigation or other proceeding (each a "***Tax Proceeding***") with respect to Taxes imposed on or with respect to the assets, operations or activities of the Acquired Company or of Family Energy. Such cooperation will include the retention and (upon the request of the other Party) the provision of records and information which are reasonably relevant to any such Tax Return or Tax Proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  Notwithstanding the above, the control and conduct of any Tax Proceeding that involves an Asserted Liability will be governed by Section 10.5.

Section 6.11.    Tax Treatment of Indemnification Payments.  Any payments made to any Party pursuant to Section 6.8 or Article 10 shall constitute an adjustment of the Purchase Price for Tax purposes and shall be treated as such by the Parties on their Tax Returns to the extent permitted by Law.

Section 6.12.    Access to Information.

(a)    From and after the Closing Date, the Buyer and FP Japan shall grant to the Sellers Representative and the Sellers (or their respective Representatives), and the Parent shall cause the Buyer and FP Japan to grant such access at all reasonable times to all of the books, records, documents, instruments, accounts, correspondence, writings, evidences of title and other papers and electronic files relating to the business of the

Acquired Company and Family Energy (the "***Records***"), including the reasonable assistance of employees responsible for maintaining such Records, and will afford the Sellers and the Sellers Representative and their legal, tax and financial advisors, the right to take extracts therefrom and to make copies thereof, for the purposes as determined by the Sellers or the Sellers Representative to be reasonably necessary for the preparation of tax returns, responses to inquiries and audits by taxing and Governmental Authorities, investigating, settling, preparing for, prosecuting, or defending any Claim or Legal Proceeding, preparing the final financial statements of the Acquired Company and Family Energy for the period January 1, 2019 through the Closing and verifying the duplicate payment in the Family Energy account as provided in 2.2(b)(ii).

(b)  The Buyer and FP Energy shall and Parent shall cause the Buyer and FP Energy to maintain such Records until the third anniversary of the Closing Date (or for six years following the Closing Date or the completion of any audit or review period as the Sellers, the Sellers Representative may reasonably request as being necessary in order to have the Records available with respect to Tax matters). However, if any of the Records pertain to any Claim or dispute pending on the third anniversary of the Closing Date, the Buyer and FP Japan shall maintain and Parent shall cause Buyer and FP Japan to maintain any of the Records designated by the Sellers or the Sellers Representative or their respective Representatives until such Claim or dispute is finally resolved and the time for all appeals has been exhausted.  Notwithstanding anything to the contrary herein, the Sellers and the Sellers Representative shall be entitled to retain a copy of the Records after the Closing.

Section 6.13.  <u>Continuing Indemnification.</u>

(a)  Buyer and Parent, jointly and severally agree

(i)  to cause the Acquired Company and Family Energy to ensure that all rights to indemnification and advancement of expenses now existing in favor of the Sellers and each of the Sellers' Affiliates and their respective, representatives, and agents (collectively, the "***D&O Indemnified Persons***"), as provided in the respective Organizational Documents shall survive the Closing and shall continue in full force and effect for a period of not less than six (6) years from the Closing Date,

(ii)  that the limitation of liability and indemnification provisions with respect to indemnification and limitations on liability set forth in such Organizational Documents shall not be amended, repealed or otherwise modified (unless required by Law) in a manner that is adverse to any Person referred to in Clause 6.13(a)(i),

(iii)  If any claim or claims are asserted or made within such 6-year period, all rights to indemnification and advancement of expenses in respect of any such claim or claims shall continue until final disposition of any and all such claims.

(b)     The obligations of the Buyer, the Parent, FP Japan and the Acquired Company under this Section 6.13 shall survive the Closing and shall not be terminated or modified in such a manner as to affect adversely any D&O Indemnified Person to whom this Section 6.13 applies without the consent of such affected D&O Indemnified Person (it being expressly agreed that the D&O Indemnified Persons to whom this Section 6.13 applies shall be third-party beneficiaries of this Section 6.13, each of whom may enforce the provisions of this Section 6.13).

(c)     In the event that the Buyer, Parent, the Acquired Company or any of their respective successors or assigns (i) consolidates with or merges into any other Person and shall not be the continuing or surviving Person in such consolidation or merger or (ii) transfers all or substantially all of its properties and assets to any Person, then, and in either such case, proper provision shall be made so that the successors and assigns of the Buyer or the Acquired Company, as the case may be, shall assume all of the obligations set forth in this Section 6.13.

(d)     The agreements and covenants contained in this Section 6.13 shall not be deemed to be exclusive of any other rights to which any D&O Indemnified Person is entitled, whether pursuant to Law, contract or otherwise. Nothing in this Agreement is intended to, shall be construed to or shall release, waive or impair any rights to directors' and officers' insurance claims under any policy that is or has been in existence with respect to the Acquired Company or its officers, directors, managers and employees, it being understood and agreed that the rights provided for in this Section 6.13 are not prior to, or in substitution for, any such claims under any such policies.

Section 6.14.   Disclaimer.  (a) THE BUYER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN OR IN THE TRANSACTION DOCUMENTS, IN ACQUIRING THE MEMBERSHIP INTERESTS, THE BUYER IS ACQUIRING THE COMPANY ASSETS ON AN "AS IS, WHERE IS, WITH ALL FAULTS" BASIS AND (b)  EACH OF THE SELLERS, AND THE ACQUIRED COMPANY EXPRESSLY DISCLAIM, AND THE BUYER ACKNOWLEDGES AND AGREES THAT IT HAS NOT RELIED UPON, ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE, EXPRESS OR IMPLIED, AS TO (A) TITLE TO ANY ASSETS OF THE ACQUIRED COMPANY OR OF FAMILY ENERGY, (B) THE CONTENTS, CHARACTER OR NATURE OF ANY DESCRIPTIVE MEMORANDUM RELATING TO THE COMPANY BUSINESS, THE BUSINESS OF FAMILY ENERGY, THE MEMBERSHIP INTERESTS OR ASSETS OF THE ACQUIRED COMPANY OR OF FAMILY ENERGY, (C) ANY ESTIMATES OF THE VALUE OF THE COMPANY BUSINESS, FAMILY ENERGY, THE BUSINESS OF FAMILY ENERGY, THE MEMBERSHIP INTERESTS, OR ANY ASSETS OR BUSINESS OF THE ACQUIRED COMPANY OR OF FAMILY ENERGY, INCLUDING THE FUTURE REVENUES GENERATED THEREBY, (D) THE MAINTENANCE, REPAIR, CONDITION, QUALITY, SUITABILITY, DESIGN, MARKETABILITY, PROSPECTS (FINANCIAL OR OTHERWISE) OR RISKS AND OTHER INCIDENTS OF THE COMPANY BUSINESS OR THE BUSINESS OF FAMILY ENERGY, OR (E) ANY OTHER DUE DILIGENCE INFORMATION.  THE SELLERS AND THE COMPANY FURTHER DISCLAIM ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE, IT BEING

EXPRESSLY UNDERSTOOD AND AGREED BY THE PARTIES THAT EXCEPT FOR THE REPRESENTATIONS, WARRANTIES AND COVENANTS SET FORTH IN THIS AGREEMENT AND THE TRANSACTION DOCUMENTS, THE BUYER SHALL BE DEEMED TO BE OBTAINING ALL OF THE SELLERS' EQUITY INTERESTS IN THE ACQUIRED COMPANY AND ITS CORRESPONDING INTERESTS IN FAMILY ENERGY AND ITS ASSETS AND BUSINESS, IN THEIR PRESENT STATUS, CONDITION AND STATE OF REPAIR, "AS IS," "WHERE IS" AND "WITH ALL FAULTS."

Section 6.15.  <u>Confidentiality</u>.  Except as required by applicable Law, each Party agrees that it will keep confidential and will not disclose or divulge the terms of this Agreement and the transactions contemplated hereby, or any confidential, proprietary or secret information that such Party may obtain from the other Parties pursuant to access to the Electronic Data Room, financial statements, reports and other materials submitted by such Parties pursuant to this Agreement or otherwise, unless such information is known, or until such information becomes known, to the public without wrongful disclosure by any disclosing Party or its attorneys, accountants, consultants, other professionals, Affiliates, or partners or members, or such information is required, in legal counsel's written opinion, to be disclosed in legal or administrative proceedings.  However, the Parties may disclose such information (a) to their respective attorneys, accountants, consultants, financial advisors and other professionals to the extent necessary to obtain their services and (b) to any lenders and prospective lenders to or of any Seller or the Buyer, as applicable.

Section 6.16.  <u>Amendment to Schedules</u>.  The Buyer, Parent and FP Japan each agrees that, with respect to the representations and warranties contained in <u>Article 3</u>, <u>Article 4</u> and <u>Article 5</u>, the Acquired Company, the Sellers (through the Sellers Representative or otherwise) shall have the continuing right until Closing to add, supplement or amend the Schedules to their representations and warranties (including the addition of schedules that are responsive to the representations and warranties contained herein but for which no schedule is contemplated as of the date hereof) with respect to any event, development, occurrence or non-occurrence of an event hereafter first occurring, or any condition first existing, after the Execution Date (and not resulting from the breach of any of the covenants or agreements herein by the Seller), which, if such event had occurred, or such condition had existed, prior to or on the Execution Date, would have been required to be set forth or described in such Schedules (each, a "***Schedule Supplement***").  For all purposes of this Agreement, including for purposes of determining whether the conditions set forth in <u>Section  7.1</u> have been fulfilled, the Schedules to the representations and warranties contained in <u>Article 3</u>, <u>Article 4</u> and <u>Article 5</u> shall be deemed to include only that information contained therein on the Execution Date and shall be deemed to exclude all information contained in the Schedule Supplement; *provided*, *however*, that if Closing shall occur, then all matters disclosed pursuant to any such Schedule Supplement at or prior to Closing shall be waived and the Buyer shall not be entitled to make an indemnification claim with respect thereto pursuant to the terms of this Agreement or otherwise.

Section 6.17.  <u>Anti-sandbagging</u>.  None of the Buyer, Parent, FP Japan or the Acquired Company may bring any action or proceeding against the Sellers or Sellers Representative or make any claim for indemnification or for or relating to a breach of warranty or breach of representation if the Buyer, Parent, FP Japan or any of their Representatives or Affiliates know, knew or should have known (based on information provided to them, information in the

Electronic Data Room, information known to them or their Representatives or employees as a result of the Parent's, FP Japan's or its Affiliates' Parent's contractual relationships with Family Energy or their work with the Japanese regulatory authorities and Japanese power generation companies and transmission companies).

ARTICLE VII.
CONDITIONS TO CLOSING

Section 7.1.    The Buyer's Closing Conditions.  The Buyer's obligations to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, waiver by the Buyer), at or prior to the Closing, of each of the following conditions:

(a)    (i) The Fundamental Representations of the Acquired Company and of the Sellers shall be true and correct in all material respects as of the date hereof and as of the Closing Date as though made on and as of the Closing Date (except to the extent such representations and warranties expressly speak as of a specified date, in which case such representations and warranties shall be true and correct in all respects on and as of such specified date), and (ii) all other representations and warranties of the Acquired Company or the Sellers set forth in this Agreement shall be true and correct as of the date hereof and as of the Closing Date as though made on and as of the Closing Date (except to the extent such representations and warranties expressly speak as of a specified date, in which case such representations and warranties shall be true and correct in all respects on and as of such specified date), except in the case of clause (ii) where the failure of such representations and warranties to be so true and correct does not, and would not reasonably be expected to, individually or in the aggregate, constitute a Material Adverse Effect.

(b)    The Acquired Company and the Sellers will have performed or caused the Acquired Company to have performed and complied in all material respects with all of the covenants required by this Agreement to be performed or complied with by them on or prior to the Closing Date.

(c)    The Buyer shall have received (or the Sellers shall be ready, willing and able to deliver) all of the closing deliveries listed in Section 7.2.

(d)    Palmco shall have forgiven all but $1,650,000 of the Palmco Loans immediately prior to the Closing and contemporaneously with the receipt by Palmco of the $1,048,000.00 to be paid by Buyer to Palmco under Section 2.2(b).

(e)    All Company Required Governmental Authorizations will have been obtained and will be in full force and effect.

(f)    There will not be any action or proceeding before any Governmental Authority with respect to which an unfavorable Order would prohibit the consummation of the transactions contemplated by this Agreement or declare the consummation of the transactions unlawful or require the consummation of the transactions to be rescinded.

Section 7.2.   The Sellers' Closing Conditions.  The obligations of the Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, waiver by the Sellers), at or prior to the Closing, of each of the following conditions:

(a)      (i) The Fundamental Representations of the Buyer shall be true and correct in all respects as of the date hereof and as of the Closing Date as though made on and as of the Closing Date (except to the extent such representations and warranties expressly speak as of a specified date, in which case such representations and warranties shall be true and correct in all respects on and as of such specified date), and (ii) all other representations and warranties of the Buyer set forth in this Agreement shall be true and correct as of the date hereof and as of the Closing Date as though made on and as of the Closing Date (except to the extent such representations and warranties expressly speak as of a specified date, in which case such representations and warranties shall be true and correct in all respects on and as of such specified date), except in the case of clause (ii) where the failure of such representations and warranties to be so true and correct does not, and would not reasonably be expected to, individually or in the aggregate, constitute a Material Adverse Effect with respect to the Buyer.

(b)      The Buyer will have performed and complied in all material respects with all the covenants required by this Agreement to be performed or complied with by it on or prior to the Closing Date.

(c)      The Sellers shall have received (or the Buyer shall be ready, willing and able to deliver) all of the closing deliveries listed in Section 8.3.

(d)      The Buyer Required Governmental Authorizations will have been obtained and will be in full force and effect.

(e)      There will not be any action or proceeding before any Governmental Authority with respect to which an unfavorable Order would prohibit the consummation of the transactions contemplated by this Agreement or declare the consummation of the transactions unlawful or require the consummation of the transactions to be rescinded.

ARTICLE VIII.
CLOSING

Section 8.1.   Closing.  The "**Closing**" will be held at the offices of Locke Lord LLP, 200 Vesey Street, 20th Floor, New York, NY 10281 or remotely via the exchange of documents and signatures by facsimile or electronic transmission, on the third Business Day following the satisfaction or waiver of all conditions to the obligations of the Parties set forth in Article 7 (other than those conditions that, by their nature, are to be satisfied only at the Closing Date, but subject to the satisfaction or valid waiver of such conditions at the Closing in accordance with this Agreement), or such other date as the Parties may mutually agree in writing (the date on which the Closing occurs is referred to herein as the "**Closing Date**"). Subject to the occurrence of the Closing, all transactions hereunder shall be deemed to have occurred as of 12:01 a.m., local New York City time, on the Closing Date.

Section 8.2.    The Sellers' Deliverables.  Subject to the terms and conditions of this Agreement, at the Closing, the Sellers will execute and deliver (or cause to be executed and delivered) to the Buyer each of the following documents (where the execution and delivery of the documents is contemplated), deliver (or cause to be delivered) to the Buyer each of the following items (where the delivery of the items is contemplated) and take (or cause to be taken) each of the following actions (where the taking of action is contemplated):

(a)    the Assignment Agreement, duly executed by the Sellers;

(b)    resignations of Robert Palmese as an officer or manager of the Acquired Company and as an officer and director of Family Energy in his capacity as such and the appointment by Robert Palmese of a person designated by Buyer to succeed Mr. Palmese as a director of Family Energy prior to the effective time of  Mr. Palmese's resignation;

(c)    an executed certificate of each of the Sellers dated as of the Closing Date and certifying that such Party is not a "foreign person" within the meaning of Code Section 1445 and, with respect to each Seller only, Code Section 1446(f);

(d)    all consents and approvals required in connection with the execution, delivery and performance of this Agreement and the Closing of the transactions contemplated herein that are listed on Schedule 8.2(d); and

(e)    the Escrow Agreement, duly executed by the Sellers Representative; and

Section 8.3.    The Buyer's Deliverables.  Subject to the terms and conditions of this Agreement, at the Closing, the Buyer will execute and deliver (or cause to be executed and delivered) to the Sellers or other applicable party, each of the following documents (where the execution and delivery of the documents is contemplated), deliver (or cause to be delivered) each of the following items (where the delivery of the items is contemplated) and take (or cause to be taken) each of the following actions (where the taking of action is contemplated):

(a)    the Purchase Price in accordance with Section 2.2;

(b)    the Assignment Agreement, duly executed by the Buyer; and

(c)    a certificate, dated as of the Closing Date, signed by a Responsible Officer of Buyer, certifying that the conditions set forth in Section 7.2(a) and Section 7.2(b) have been satisfied.

The Parties acknowledge that the Buyer may waive the requirement for delivery of any of the items listed in Section 8.2 at Closing and that the Sellers may waive the requirement for delivery of any of the items listed in Section 8.3 at Closing and that such waivers shall in no way effect the enforceability of the remainder of the terms of this Agreement.

# ARTICLE IX.
# TERMINATION RIGHTS

Section 9.1.    Termination Rights.  This Agreement may be terminated and the transactions contemplated hereunder abandoned at any time prior to the Closing as follows:

(a)    by mutual written consent of the Buyer and the Sellers Representative;

(b)    by the Sellers Representative or the Buyer if there shall be in effect a final non-appealable Order of a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; *provided*, that the right to terminate this Agreement under this Section 9.1(b) shall not be available to the Sellers Representative, on the one hand, or the Buyer, on the other hand, if such Order was primarily due to the failure of the Sellers, on the one hand, or the Buyer, on the other hand, to perform any of their respective obligations under this Agreement;

(c)    by the Sellers Representative in the event that there will have been a breach or inaccuracy of the Buyer's representations and warranties in this Agreement or a failure by the Buyer to perform its covenants in this Agreement, in any such case in a manner that the conditions to the Closing set forth in Section 9.2(a) or Section 8.2(b) would not be satisfied (*provided* that none of the representations and warranties set forth in Article 3, Article 4 or Article 5 will have become and continue to be untrue in a manner that would cause the condition set forth in Section 9.1(a) not to be satisfied and there has been no failure by the Sellers to perform their covenants in such a manner as would cause the condition set forth in Section 9.1(b) not to be satisfied); *provided*, *however*, that the Sellers Representative will provide notice to the Buyer as soon as practicable after becoming aware of any such breach, inaccuracy or failure of the Buyer; and *provided further*, that if such breach, inaccuracy or failure is curable by the Buyer through the exercise of its commercially reasonable efforts then, for up to thirty (30) days (or any shorter period of time that remains between the date the Buyer receives written notice of such violation or breach and the Outside Date) from the date the Buyer receives notice of such breach, inaccuracy or failure from the Sellers, as long as Buyer continues to exercise such commercially reasonable efforts, the Sellers Representative may not terminate this Agreement under this Section 9.1(c) prior to the later of (x) the Outside Date or (y) the end of such 30-day period;

(d)    by the Buyer in the event that there has been a breach or inaccuracy of the representations and warranties set forth in Article 3, Article 4 or Article 5 or a failure by the Sellers to perform their respective covenants in this Agreement, in any such case in a manner that the conditions to the Closing set forth in Section 9.1(a) or Section 9.1(b) would not be satisfied (*provided* that none of the representations and warranties of the Buyer will have become and continue to be untrue in a manner that would cause the condition set forth in Section 8.2(a) not to be satisfied and there has been no failure by the Buyer to perform its covenants in such a manner as would cause the condition set forth in Section 8.2(b) not to be satisfied); *provided*, *however*, that Buyer will provide notice to the Sellers as soon as practicable after becoming aware of any such breach or

inaccuracy of the Sellers; and *provided further*, that if such breach or inaccuracy is curable by the Sellers through the exercise of commercially reasonable efforts then, for up to thirty (30) days (or any shorter period of time that remains between the date the Sellers receive written notice of such violation or breach and the Outside Date) from the date the Sellers receive notice of such breach or inaccuracy from the Buyer, as long as the Sellers continue to exercise such commercially reasonable efforts, the Buyer may not terminate this Agreement under this Section 9.1(d) prior to the later of (x) the Outside Date or (y) the end of such 30-day period; or

       (e)    by either the Buyer or the Sellers Representative following the Outside Date (as extended pursuant to the terms of this Agreement); *provided* that the right to terminate this Agreement under this Section 9.1(e) will not be available to any Party whose breach of any representation, warranty or covenant contained in this Agreement will have been the cause of, or will have resulted in, the failure of the Closing to occur on or before the Outside Date.

Section 9.2.    Effect of Termination.  In the event of the termination of this Agreement pursuant to Section 9.1, all obligations of the Parties will terminate, except for the provisions of Section 6.2(c), Section 6.3(b), Section 6.3(c), Section 6.4, Section 6.17, this Section 9.2, Section 9.3, and Article 11; *provided* that the Confidentiality Agreement will remain in full force and effect following any termination of this Agreement pursuant to this Article 9 and shall be binding upon the Acquired Company, Family Energy, Buyer, Parent and FP Japan as if they were all parties thereto on the date thereof.

Section 9.3.    Remedies.

       (a)    Notwithstanding anything herein to the contrary, if this Agreement is terminated pursuant to (i) Section 6.1(c) upon the Buyer's breach of any representation, warranty or covenant contained in this Agreement or (ii) Section 9.1(e) and at such time the Sellers Representative had the right to terminate this Agreement pursuant to Section 10.1(c), then the Sellers may pursue all available remedies at law or in equity against the Buyer, including seeking to (x) obtain in any court of competent jurisdiction injunctive relief to restrain any violation by the Buyer of its covenants contained in this Agreement, (y) compel specific performance by the Buyer of one or more of its obligations contained in this Agreement, or (z) obtain a money judgment against the Buyer for any damage to the Sellers that may result from any breach by the Buyer of any of its representations, warranties or covenants contained in this Agreement.

       (b)    Without intending to limit the remedies available to the Parties hereunder, each Party acknowledges that a breach of, conflict with, or failure to perform or comply with, any of the provisions contained in this Agreement would result in material irreparable injury to the other Party or their respective Affiliates for which there is no adequate remedy at law and that it will not be possible to measure damages for such injuries precisely. Accordingly, the Parties agree that they shall be entitled to equitable relief, including in the form of an injunction or injunctions, to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, this being in addition to any other remedy to which any Party is entitled at law or in equity.

The Parties further agree (i) to cooperate fully in any attempt by the other Party to obtain any such equitable remedy, (ii) to waive any requirement for the security or posting of any bond in connection with any such equitable remedy and (iii) not to assert that a remedy of specific performance is unenforceable, invalid or contrary to Law or inequitable for any reason, or to assert that a remedy of monetary damages would provide an adequate remedy. Each of the Parties acknowledges and agrees that such right of specific performance is an integral part of the transactions contemplated by this Agreement and without that right, the Parties would not have entered into this Agreement.

ARTICLE X.
INDEMNIFICATION

Section 10.1. <u>Survival</u>. The respective representations, warranties, covenants and agreements of the Acquired Company, the Sellers, the Parent, FP Japan and the Buyer contained in this Agreement and the rights to indemnification with respect thereof shall (a) in the case of the representations and warranties (or any certificate delivered in connection therewith) survive the Closing Date for a period of three (3) years ; (b) in the case of any of the Parties' respective covenants and agreements which contain express survival periods or contemplate future performance or obligations after the Closing, survive the Closing Date for the period provided in accordance with their express terms, or in the absence of such express terms, until such performance is fully performed or such obligations are fully satisfied; and (c) in the case of all covenants and agreements not covered by the immediately preceding clause (b), such covenants and agreements shall not survive the Closing. No Party shall have any liability for indemnification claims made under this <u>Article 10</u> with respect to any such covenant or agreement unless a written notice of claim (describing in reasonable detail the claim, including an estimate of Losses attributable to such claim) is provided prior to the expiration of any applicable survival period for such representation, warranty, covenant or agreement provided in this <u>Section 10.1</u>. If a Buyer Indemnified Party or a Seller Indemnified Party, as applicable, delivers written notice to the Indemnifying Party for a claim for indemnification or recovery within the applicable survival period, such claim shall survive until satisfied, otherwise finally resolved or judicially resolved.

Section 10.2. <u>Indemnification by the Sellers</u>. Subject to the limitations on recourse and recovery set forth in this <u>Article 10</u>, from and after the Closing, the Sellers, severally and not jointly, will, indemnify, defend and hold harmless the Buyer and its Affiliates and each of their respective officers, directors, managers, members and employees (the "***Buyer Indemnified Parties***") from and against any and all Losses imposed upon or incurred after the Closing in connection with, arising out of or resulting from any non-fulfillment or breach by such Sellers of any covenant or agreement made by such Sellers contained in this Agreement.

Section 10.3. <u>Indemnification by Buyer</u>. Subject to the limitations on recourse and recovery set forth in this <u>Article 10</u>, from and after the Closing, the Buyer shall indemnify, advance defense costs for, defend and hold harmless the Sellers, the Sellers Representative and their respective Affiliates and each of their respective officers, directors, managers, members and employees from and against any and all Losses imposed upon or incurred after the Closing in

connection with, arising out of or resulting from any nonfulfillment or breach by Parent or by Buyer of any covenant or agreement made by the Buyer under this Agreement.

Section 10.4.   Limitations.

(a)      Notwithstanding anything to the contrary herein, in no event shall the Sellers' and their respective Affiliates' aggregate liability for Losses exceed the ¥181,778,111 due to Palmco under Section 2.2(a).  Buyer, Sellers, Parent, FP Japan, the Acquired Company and Family Energy agree that Buyer's, Parent's and FP Japan's sole remedy for any Claim or Loss, including any breach of representation, breach of warranty, fraud, Claim, demand for indemnification or other cause shall be against the ¥181,778,111 due to Palmco under Section 2.2(a), whether in contract, tort, strict liability, for fraud, negligence, indemnification or otherwise.

(b)      Notwithstanding anything to the contrary herein, with respect to any indemnification obligations of the Sellers, if insurance coverage is available, the Buyer must first seek full recovery under any applicable insurance policy prior to seeking recovery from the ¥181,778,111 due to Palmco.  In no event may any claims be made directly against the Sellers or Palmco for any indemnification, defense or hold harmless obligation.

(c)      Notwithstanding anything to the contrary contained in this Agreement, under no circumstances will any Party or any of its Affiliates be entitled to recover more than one time for any Loss under this Agreement, and to the extent a Party or any of its Affiliates is compensated for a matter through the adjustments provided for in Section 2.3 or otherwise, such Party and its Affiliates will not have a separate right to indemnification for such matter. Without limiting the generality of the prior sentence, if a set of facts, conditions or events constitutes a breach of more than one covenant or agreement that is subject to the indemnification obligations under this Article 11, as applicable, only one recovery of Losses shall be allowed, and in no event shall there be any indemnification or duplication of payments or recovery under different provisions of this Agreement arising out of the same facts, conditions or events.

(d)      No Seller nor the Sellers Representative shall have any liability for a breach of any covenant or obligation under this Agreement to be performed by another Seller, as applicable.

Section 10.5.   Claims Procedures.

(a)      Promptly after receipt by any indemnified Person of notice of the commencement or assertion of any Claim or Legal Proceeding by a third party or circumstances which, with the lapse of time, such indemnified Person believes is likely to give rise to a Claim or Legal Proceeding by a third party or of facts causing any indemnified Person to believe it has a Claim for indemnification hereunder (an "***Asserted Liability***"), such indemnified Person will give prompt written notice thereof (the "***Claim Notice***") to the relevant indemnifying Person.  As long as the Claim Notice is given in accordance with Section 10.4(c), the failure to so notify the indemnifying Person will not

relieve the indemnifying Person of its obligations or liability hereunder, except to the extent such failure prejudices the indemnifying Person. The Claim Notice will describe the Asserted Liability in reasonable detail, and will indicate the amount (estimated, if necessary) of the Loss that has been or may be suffered. The indemnified Person and the indemnifying Person agree to keep each other reasonably appraised of any additional information concerning any Asserted Liability.

(b)      As to an Asserted Liability arising from a third party action, the indemnifying Person will be, subject to the limitations set forth in this Section 10.5, entitled to assume control of and appoint lead counsel for such defense only for as long as it conducts such defense with reasonable diligence.  The indemnifying Person will keep the indemnified Persons advised of the status of such third party action and the defense thereof on a reasonably current basis and will consider in good faith the recommendations made by the indemnified Persons with respect thereto.  If the indemnifying Person assumes the control of the defense of any third party action in accordance with the provisions of this Section 10.5, the indemnified Person will be entitled to participate in the defense of any such third party action and to engage, at its expense, separate counsel of its choice for such purpose, it being understood, however, that the indemnifying Person will continue to control such defense; *provided* that notwithstanding the foregoing, the indemnifying Person will pay the reasonable costs and expenses of such defense (including reasonable attorneys' fees) of the indemnified Persons if (x) the indemnified Person's outside counsel will have reasonably concluded and advised in writing (with a copy to the indemnifying Person) that there are defenses available to such indemnified Person that are different from or additional to those available to the indemnifying Person, or (y) the indemnified Person's outside counsel will have advised in writing (with a copy to the indemnifying Person) the indemnified Person that there is a conflict of interest that would make it inappropriate under applicable standards of professional conduct to have common counsel for the indemnifying Person and the indemnified Person.  Notwithstanding the foregoing, the indemnifying Person will obtain the prior written consent of the indemnified Person before entering into any settlement, compromise, admission or acknowledgement of the validity of such Asserted Liability if the settlement requires an admission of guilt or wrongdoing on the part of the indemnified Person, subjects the indemnified Person to criminal liability or does not unconditionally release the indemnified Person from all liabilities and obligations with respect to such Asserted Liability or the settlement imposes injunctive or other equitable relief against, or any continuing obligation or payment requirement on, the indemnified Person.

(c)      Each Party will cooperate in the defense or prosecution of any Asserted Liability arising from a third party action and will furnish or cause to be furnished such records, information and testimony (subject to any applicable confidentiality agreement), and attend such conferences, discovery proceedings, hearings, trials or appeals as may be reasonably requested in connection therewith.

(d)      In the case of a Claim not based upon a third party action ("***Direct Claim***"), the indemnifying Person shall have forty-five (45) days from its receipt of the Claim Notice to either (i) admit its obligation to provide indemnification or (ii) dispute

the Claim for indemnification, and provide a written explanation for its position and supporting documentation. In the event that the indemnifying Person disputes a Claim Notice for a Direct Claim, the Parties, including appropriate management representatives, shall promptly seek to negotiate a resolution in good faith. If the Parties are unable to resolve the dispute within ninety (90) days after the indemnifying Person first receives the Claim Notice for a Direct Claim, then the indemnified Person may seek any remedy available to it under this Agreement. If the indemnifying Person fails to respond to the Claim Notice relating to a Direct Claim within such 45-day period, then the indemnifying Person shall be conclusively deemed obligated to provide indemnity for all reasonable costs and expenses relating to the Direct Claim referenced in the Claim Notice.

(e)     With respect to any Direct Claims, the indemnifying Person shall pay an indemnification payment due under this Article 10 to the indemnified Person within five (5) Business Days after it is established (by final nonappealable court Order or agreement of the parties) that the indemnified Person is entitled to such payment under this Article 9. If a Claim involves an undisputed and disputed portion, the indemnifying Person will promptly pay the undisputed portion, and the disputed portion will be paid as, if and when determined.

Section 10.6.    Waiver of Remedies.

(a)     The Parties hereby agree that from and after the Closing no Party shall have any liability, and no Party shall (and each Party will cause its respective Affiliates not to) make any Claim, for any Loss or any other matter, under, relating to or arising out of this Agreement (including breach of representation, warranty, covenant or agreement), any transaction document or any other contract or other matter delivered pursuant hereto, or the transactions contemplated hereby, whether based on contract, tort, strict liability, other Law or otherwise, except for a claim for indemnification pursuant to this Article 10, and this Article 10 set forth the sole and exclusive remedies available to the Parties and any other Person entitled to indemnification hereunder relating to the transactions contemplated by this Agreement. Neither the Sellers nor the Buyer will have any remedies or cause of action (whether in contract or in tort) for any statements, communications, disclosures, failures to disclose, representations or warranties not expressly set forth in this Agreement or any transaction document.

(b)     IN FURTHERANCE OF THE FOREGOING, THE BUYER AND THE PARENT, EACH. HEREBY WAIVES AND RELEASES FROM AND AFTER THE CLOSING, TO THE FULLEST EXTENT PERMITTED UNDER LAW, AND AGREES NOT TO SUE, FOR ANY AND ALL CLAIMS SELLERS OR ANY OF THEIR AFFILIATES OR ADVISORS INCLUDING THE ACQUIRED COMPANY WITH RESPECT TO MATTERS ARISING DURING THE STRADDLE PERIOD, THE PERIOD PRIOR TO OR FROM AND AFTER THE CLOSING DATE, WHICH THEY MAY HAVE AGAINST THE SELLERS, OR ANY OF THEIR AFFILIATES, INCLUDING THE ACQUIRED COMPANY, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES, AGENTS OR ADVISORS RELATING TO OR ARISING FROM (I) THE TRANSACTION DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED THEREBY, OR (II) THE COMPANY

BUSINESS, THE MEMBERSHIP INTERESTS, THE OWNERSHIP OF FAMILY ENERGY OR THE ASSETS OF THE ACQUIRED COMPANY OR OF FAMILY ENERGY, OR (III) ANY ACTIONS OR OMISSIONS BY ANY OFFICER, DIRECTOR OR EMPLOYEE OF THE ACQUIRED COMPANY OR OF FAMILY ENERGY, THE SELLERS, OR ANY OF THEIR AFFILIATES, IN SUCH PERSON'S CAPACITY AS SUCH, OR BY THE SELLERS, IN THEIR CAPACITY AS MEMBERS OF THE ACQUIRED COMPANY PRIOR TO THE CLOSING, PROVIDED ANY SUCH ACTIONS WERE TAKEN OR OMISSIONS WERE AVOIDED, IN EACH CASE, IN GOOD FAITH, EXCEPT PURSUANT TO THE INDEMNIFICATION PROVISIONS SET FORTH IN THIS <u>ARTICLE 10</u> AND REGARDLESS OF WHETHER BASED ON CONTRACT, TORT, STRICT LIABILITY, FRAUD, OTHER LAW OR OTHERWISE AND WHETHER OR NOT ARISING FROM THE SELLERS', OR ANY OF THEIR AFFILIATES' SOLE, JOINT OR CONCURRENT NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT.

(c)     NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, NO PARTY NOR ANY OF ITS AFFILIATES WILL BE LIABLE FOR THE FOLLOWING ("*NON-REIMBURSABLE DAMAGES*"): SPECIAL, PUNITIVE, EXEMPLARY, INCIDENTAL, CONSEQUENTIAL OR INDIRECT DAMAGES (INCLUDING ANY DAMAGES ON ACCOUNT OF LOST PROFITS OR OPPORTUNITIES, DIMINUTION IN VALUE OR LOST OR DELAYED BUSINESS BASED ON VALUATION METHODOLOGIES ASCRIBING A DECREASE IN VALUE TO THE ACQUIRED COMPANY, ON THE BASIS OF A MULTIPLE OF A REDUCTION IN A MULTIPLE-BASED OR YIELD-BASED MEASURE OF FINANCIAL PERFORMANCE), WHETHER BASED ON CONTRACT, TORT, STRICT LIABILITY, FRAUD. OTHER LAW OR OTHERWISE AND WHETHER OR NOT ARISING FROM THE OTHER PARTY'S OR ANY OF ITS AFFILIATES' SOLE, JOINT OR CONCURRENT NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT; *PROVIDED, HOWEVER*, THAT ANY AMOUNTS PAYABLE TO THIRD PARTIES PURSUANT TO A CLAIM BY A THIRD PARTY WILL NOT BE DEEMED NON-REIMBURSABLE DAMAGES.

Section 10.7.   Determination of Amount of Damages; Mitigation.

(a)     The amount of any Losses for which indemnification is provided under this <u>Article 10</u> will be limited to the Losses suffered by the indemnified Person and will be computed net of (i) any insurance or other proceeds actually received by the indemnified Person in connection with such Losses, including under any insurance policy, (ii) any Tax benefit actually realized (including as a result of any deduction or credit) by the indemnified Person or any of its Affiliates as a result of such Losses, (iii) any indemnity, contribution or other similar payment the indemnified Person actually received from any Person with respect to such Loss, and (iv) any other payment or monetary recoupment received, realized or retained by the indemnified Person as a result of the events giving rise to the Claim.  Any indemnified Person that becomes aware of Losses for which it intends to seek indemnification hereunder will use commercially reasonable efforts to pursue claims and collect any amounts to which it may be entitled under insurance policies or from third parties (pursuant to indemnification agreements or

otherwise) and will use commercially reasonable efforts to mitigate such Losses; *provided* that the indemnified Person will promptly notify either (y) the Sellers, if such indemnified Person is the Buyer, or (z) the Buyer, if such indemnified Person is a Seller, in each case, of any efforts to mitigate. If any third party recovery or insurance recovery is realized after having previously received indemnity Claim proceeds hereunder, such indemnified Person will promptly tender to the respective indemnifying Person an amount equal to such third party recovery or insurance recovery equal to the amount of the indemnity Claim proceeds paid by the indemnifying Person. The Buyer Indemnified Parties shall not be entitled to indemnification pursuant to this Article 10 for any Loss underlying such indemnification claim to the extent that such Loss (or any part thereof) arises, or is increased, as a result of a change after the Closing in any accounting principle, method or policy (including any such change in GAAP or application thereof), in any Tax reporting practice of the Acquired Company. In no event shall the Sellers have any liability for indemnification under this Article 10 for any Losses to the extent such Losses are caused or initiated by any action or omission by any Buyer Indemnified Party or the Acquired Company at the request or direction of any Buyer Indemnified Party, including to the extent any Losses resulted from the bad faith, gross negligence or willful misconduct of such Buyer Indemnified Parties.

(b)     The Parties agree that no indemnified Person shall have any recourse under this Article 10 for any Losses that such indemnified Person would not have suffered had such indemnified Person exercised commercially reasonable efforts to mitigate such Losses within a reasonable amount of time following the discovery by such indemnified Person of the fact, event or circumstance giving rise to such Losses (and for an indemnified Person that is not a natural Person, the bringing to the attention of a responsible officer thereof of such fact, event or circumstance).

## ARTICLE XI.
## MISCELLANEOUS

Section 11.1.   Successors and Assigns.  This Agreement (and all covenants, rights, obligations, and agreements created hereunder) will be binding upon, and inure to the benefit of, the Parties and their respective successors and permitted assigns.  No Party will assign this Agreement or any part hereof without the prior written consent of the other Parties.

Section 11.2.   Notices.  All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally, by electronic transmission, by reputable national overnight courier service or by registered or certified mail (postage prepaid) to the Buyer at the following address and to the Sellers, Seller's Representative and Palmco to the addresses set forth on their signature pages attached hereto, as applicable:

|  |  |
|---|---|
| If to the Buyer, to: | 1485 Hartford Terrace |
|  | Alpharetta, GA 30004 |
|  | Attn: Manager |
|  | Email: |
|  | Fax: |
| *with a copy to (which will not constitute notice)*: | Sonjui L. Kumar, Esq. |
|  | KPPB LAW |
|  | One Lakeside Commons, Suite 800 |
|  | Fax: 678.443.2230 |
|  | skumar@kppblaw.com |

or to such other address or addresses as the Parties may from time to time designate in writing. For purposes of any notice requirements hereunder, delivery shall have deemed to be made (i) on the date of such delivery if delivered personally, (ii) on the date that is the day after the date on which such notice is sent through a reputable national overnight courier service, (iii) on the date that is five days after the date on which such notice is sent by registered or certified mail or (iv) if sent by electronic mail, when confirmation of receipt is received by sender. Copies of notices to the Sellers, Palmco or to the Sellers Representative shall be given to Ira S. Greene, Locke Lord LLP, Brookfield Place, 200 Vesey Street-20th Floor, New York, NY 10281 in the same manner as is required for a notice to a Seller or to the Sellers Representative.

Section 11.3.  Counterparts.  This Agreement may be executed in any number of counterparts, each of which will be considered an original, but all of which together will constitute one and the same instrument. Transmission by telefax, email or any electronic or digital method of a copy of an executed counterpart or counterpart signature page shall constitute delivery of the originally executed counterpart for all purposes.  Any facsimile or .pdf copies hereof or signature hereon shall, for all purposes, be deemed originals.

Section 11.4.  Rights.  The failure of a Party to exercise any right granted hereunder will not impair nor be deemed a waiver of such Party's privilege of exercising that right at any subsequent time or times, except as expressly provided herein.

Section 11.5.  Amendments.  This Agreement may not be amended or modified in any manner except by a written document signed by the Parties that expressly amends this Agreement.  Oral amendments and purported oral terminations are void.

Section 11.6.  No Waiver.  No waiver by a Party of any of the provisions of this Agreement will be deemed or will constitute a waiver of any other provision hereof (whether or not similar), nor will such waiver constitute a continuing waiver unless expressly provided.  No waiver will be effective unless made in writing and signed by the Party to be charged with such waiver. Oral waivers are void.

Section 11.7.    Governing Law; Jurisdiction; Severability.

(a)    This Agreement will be governed by, construed, and enforced in accordance with the Laws of the State of New York, without regard to choice of law principles that would require the application of the Laws of any other jurisdiction.

(b)    The following provisions shall be interpreted to be consistent with and supplemental to those in Section 11.22. Each Party agrees that the provisions of this Agreement relating to determination of disputes by arbitration under the ICDR Rules are intended to provide the exclusive means of finally resolving disputes among or between them. The Parties also agree that any state or federal court in New York, County, New York shall have jurisdiction to compel arbitration or to enter orders in aid of arbitration. Each of the Parties irrevocably submits to the personal; jurisdiction of such courts solely for such purposes and to confirm any award rendered by the arbitrators under the ICDR Rules arising out of or related to this Agreement, its execution, its interpretation and any default hereunder or the transactions contemplated hereby. The Parties further agree that the Parties will not bring suit with respect to any disputes arising out of this Agreement or the transactions contemplated hereby, or its formation or interpretation in any court or jurisdiction other than the above specified courts other than to enforce the award of the ICDR arbitrators..

(c)    To the extent that any Party has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, each such Party hereby irrevocably (i) waives such immunity in respect of its obligations with respect to this Agreement, and (ii) submits to the personal jurisdiction of any court described in Section 11.7(b).

(d)    Each Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby in any court referred to in Section 11.7(b). Each of the Parties hereby irrevocably waives, to the fullest extent permitted by Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(e)    Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable Law, but if any provision of this Agreement shall be deemed prohibited or invalid under such applicable Law, such provision shall be ineffective to the extent of such prohibition or invalidity, and such prohibition or invalidity shall not invalidate the remainder of such provision or the other provisions of this Agreement.

Section 11.8.   Jury Waiver.  TO THE EXTENT NOT PROHIBITED BY LAW THAT CANNOT BE WAIVED, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, THE RIGHT TO A JURY IN ANY SUIT, ACTION OR

PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS <u>SECTION 11.8</u> WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

Section 11.9.   <u>No Third Party Beneficiaries</u>.  Except for the Persons indemnified hereunder including <u>Section 6.13</u> and <u>Article 10</u> and except as otherwise provided in this Agreement, this Agreement is for the sole benefit of the Parties and will not inure to the benefit of any other Person whomsoever or whatsoever, it being the intention of the Parties that no third Person will be deemed a third party beneficiary to this Agreement.

Section 11.10. <u>Further Assurances</u>.  Subject to the terms and conditions set forth in this Agreement, each Party will take such acts and execute and deliver such documents as may be reasonably required to effectuate the purposes of this Agreement; *provided*, *however*, that no such act or document shall increase a Party's liabilities or obligations, or decrease its rights or benefits, under this Agreement or any Transaction Document.

Section 11.11. <u>Expenses</u>.  Except as otherwise expressly provided herein, each Party will bear its own expenses incurred in connection with this Agreement and the transactions contemplated hereby whether or not such transactions will be consummated, including all fees of its legal counsel, financial advisers, accountants and other Representatives.

Section 11.12. <u>Entire Agreement</u>.  The English language texts of this Agreement and of each Schedule and Exhibit attached hereto are the only authentic texts.  This Agreement (together with the Recitals, Schedules and Exhibits attached hereto), the Confidentiality Agreement, and the other Transaction Documents, constitute the entire agreement among the Parties and supersede any other agreements, whether written or oral, that may have been made or entered into by the Parties or any of their respective Affiliates relating to the transactions contemplated hereby and thereby. The Parties hereto have voluntarily agreed to define their rights, liabilities and obligations respecting the sale and purchase of the Membership Interests and exclusively in contract pursuant to the express terms and provisions of this Agreement. The Parties expressly disclaim they are owed any duties or are entitled to any remedies not expressly set forth in this Agreement, and each acknowledge that this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's-length negotiation.

Section 11.13. <u>Schedules</u>.  Unless the context otherwise requires, all capitalized terms used in the Schedules will have the respective meanings assigned in this Agreement.  No reference to or disclosure of any item or other matter on the Schedules will be construed as an admission, acknowledgment, or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed on the Schedules.  No disclosure on the Schedules relating to any possible breach or violation of any agreement, Law or Governmental Authorization will be construed as an admission or indication that any such breach or violation exists or has actually occurred. The disclosure of any fact or item in any Schedule shall, should the existence of such fact or item be relevant to any other Schedules, be deemed to be disclosed with respect to that other Schedule so long as the relevance of such disclosure to such other section is reasonably apparent from the nature of such disclosure. Any

reference to a Contract, Company Asset, statement, plan, report or other document or item of any kind in the Schedules will be deemed a full disclosure of all of the terms of such document and it will not be necessary to identify or reference specific provisions of such Contracts, Company Assets, statements, plans, reports or other documents or items in order to make a full disclosure thereof. In no event will the inclusion of any matter in the Schedules be construed, deemed or interpreted to broaden a Party's representations, warranties, covenants or agreements contained in this Agreement. No reference in the Schedules to any agreement or document will be construed as an admission or indication that such agreement or document is enforceable or currently in effect or that there are any obligations remaining to be performed or any rights that may be exercised under such agreement or document except to the extent that any such agreement or document is referred to by reference to the Schedules in an express representation or warranty to that effect set forth in the Agreement. The headings and descriptions of the disclosures in the Schedules are for convenience of reference only and are not intended to and do not alter the meaning of any provision of this Agreement or of the Schedules. The information provided in the Schedules is solely for the use of the Parties in connection with the purchase and sale of the Membership Interests and will be subject to the terms of this Agreement, and may not be used or relied upon by any other Person or for any other purpose.

Section 11.14. <u>Headings</u>.  The table of contents, headings and captions in this Agreement have been inserted for convenience of reference only and will not define or limit any of the terms and provisions hereof.

Section 11.15. <u>Rights and Remedies</u>.  Except as otherwise provided in this Agreement, each Party reserves to itself all rights, counterclaims, other remedies, and defenses to which such Party is or may be entitled arising from or out of this Agreement or as otherwise provided by Law.

Section 11.16. <u>Specific Performance</u>.  Each of the Parties acknowledges and agrees that the other Party would be damaged irreparably in the event that the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached. Accordingly, each of the Parties agrees that the other Party will be entitled to seek a temporary restraining order, an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the provisions of this Agreement in any action or proceeding instituted before the ICDR or in any court of the United States or any state thereof having jurisdiction over the Parties and the matter without first proceeding before the ICDR, in addition to any other remedy to which they may be entitled under this Agreement.

Section 11.17. <u>No Inducements</u>.  No director, employee, or agent of any Party will give or receive any commission, fee, rebate, gift or entertainment of significant cost or value in connection with this Agreement.

Section 11.18. <u>No Partnership</u>.  Nothing contained in this Agreement will be construed to create an association, trust, partnership or joint venture or impose a trust, fiduciary, or partnership duty, obligation, or liability on or with regard to either Party.

Section 11.19. <u>Conflict Waiver; Attorney-Client Privilege</u>.  Each of the Parties hereto acknowledges and agrees, on its own behalf and on behalf of its directors, managers, members, partners, officers, employees and Affiliates, that:

(a)     Locke Lord LLP has acted as counsel to the Sellers, the Sellers Representative and their Affiliates (individually and collectively, the "***Seller Group***"), and the Acquired Company in connection with the negotiation, preparation, execution and delivery of this Agreement and the consummation of the transactions contemplated hereby. The Acquired Company, Family Energy, Buyer and Parent agree, and shall cause the Acquired Company and Family Energy to agree following the Closing, that, following consummation of the transactions contemplated hereby, such representation and any prior representation of the Acquired Company by Locke Lord LLP (or any successor) (the "***Seller Group Law Firm***") shall not preclude the Seller Group Law Firm from serving as counsel to any Seller or the Seller Group or any director, member, shareholder, partner, officer or employee of the Seller Group, in connection with any litigation, claim or obligation arising out of or relating to this Agreement or the transactions contemplated hereby or by any of the other Transaction Documents.

(b)     None of the Parent, the Buyer, FP Japan, Family Energy or the Acquired Company shall, and they shall cause the Acquired Company and Family Energy not to, seek or have the Seller Group Law Firm disqualified from any such representation based upon the prior representation of the Acquired Company by the Seller Group Law Firm. Each of the Parties hereto hereby consents thereto and waives any conflict of interest arising from such prior representation, and each of such parties shall cause any of its Affiliates to consent to waive any conflict of interest arising from such representation. Each of the Parties acknowledges that such consent and waiver is voluntary, that it has been carefully considered, and that the Parties have consulted with counsel or have been advised they should do so in connection herewith. The covenants, consent and waiver contained in this <u>Section 11.19</u> shall not be deemed exclusive of any other rights to which the Seller Group Law Firm is entitled whether pursuant to law, contract or otherwise.

(c)     All communications between the Seller Group or the Acquired Company, on the one hand, and the Seller Group Law Firm, on the other hand, relating to the negotiation, preparation, execution and delivery of this Agreement and the consummation of the transactions contemplated hereby (the "***Privileged Communications***") shall be deemed to be attorney-client privileged and the expectation of client confidence relating thereto shall belong solely to the Seller Group and shall not pass to or be claimed by the Parent, the Buyer, Family Energy or the Acquired Company. Accordingly, the Parent, the Buyer, Family Energy and the Acquired Company shall not have access to any Privileged Communications or to the files of the Seller Group Law Firm relating to such engagement from and after Closing. Without limiting the generality of the foregoing, from and after the Closing, (i) the Seller Group (and not the Parent, the Buyer, Family Energy or the Acquired Company) shall be the sole holders of the attorney-client privilege with respect to such engagement, (ii) none of the Parent, the Buyer, Family Energy or the Acquired Company shall be a holder thereof, (iii) to the extent that files of the Seller Group Law Firm in respect of such engagement constitute property of the client, only the Seller Group (and none of the Parent, the Buyer, Family Energy nor the

Acquired Company) shall hold such property rights and (iv) Seller Group Law Firm shall have no duty whatsoever to reveal or disclose any such attorney-client communications or files to the Parent, FP Japan, the Buyer, Family Energy or the Acquired Company by reason of any attorney-client relationship between the Seller Group Law Firm and the Acquired Company or otherwise. Notwithstanding the foregoing, if a dispute arises between the Parent, the Buyer or any of their Affiliates (including Family Energy or Acquired Company), on the one hand, and a third party other than any of the Seller Group, on the other hand, the Buyer and its Affiliates (including the Acquired Company) may assert the attorney-client privilege to prevent disclosure of confidential communications to such third party; *provided, however*, that neither the Buyer nor any of its Affiliates (including the Acquired Company) may waive such privilege without the prior written consent of the Seller Group in each instance. If the Parent, FP Japan, the Buyer or any of their Affiliates (including Family Energy or the Acquired Company) is legally required by an Order or otherwise legally required to access or obtain a copy of all or a portion of the Privileged Communications, to the extent (x) permitted by applicable Law, and (y) advisable in the written opinion of the Buyer's United States based and United States licensed counsel, then the Buyer shall immediately (and, in any event, within five (5) Business Days) notify the Sellers in writing so that the Sellers can seek a protective order or other protection against disclosure or further disclosure.

(d)     This Section is intended for the benefit of, and shall be enforceable by, the Seller Group Law Firm. This <u>Section 11.19</u> shall be irrevocable, and no term of this <u>Section 11.19</u> may be amended, waived or modified, without the prior written consent of the Seller Group Law Firm.  This Section 11.19 shall survive the Closing and any termination of this Agreement.

Section 11.20.  <u>Non-Recourse</u>.  Except as otherwise provided in <u>Section 6.7</u> and <u>Section 6.15</u>, this Agreement may only be enforced against, and any claim or cause of action based upon, arising under, out of, or in connection with, or related in any manner to this Agreement or the transactions contemplated hereby may only be brought against, the entities that are expressly named as Parties in the preamble of this Agreement (the "**Contracting Parties**") and then only with respect to the specific obligations set forth herein with respect to such Contracting Party. No Person that is not a Contracting Party, including any past, present or future Representative or Affiliate of any Contracting Party or any Affiliate of any of the foregoing (each, a "***Nonparty Affiliate***"), shall have any liability (whether in contract, tort, at law or in equity, or granted by statute or otherwise) for any claims, causes of action or other obligations or liabilities arising under, out of, or in connection with, or related in any manner to this Agreement or the transactions contemplated hereby, or based on, in respect of, or by reason of this Agreement or its negotiation, execution, performance or breach.  To the maximum extent permitted by applicable Law,

(a)     each Contracting Party hereby waives and releases all such liabilities, claims, causes of action and other obligations and liabilities against any such Nonparty Affiliates,

(b)     each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available to avoid or

disregard the entity form of a Contracting Party or otherwise impose liability of a Contracting Party on any Nonparty Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise, and

(c)     each Contracting Party disclaims any reliance upon any Nonparty Affiliates with respect to the performance of this Agreement or any representation or warranty made in, in connection with, or as an inducement to this Agreement.

Section 11.21. <u>Sellers Representative.</u>

(a)     Each Seller shall, for himself or herself and his or her heirs, Representatives, successors and assigns, irrevocably constitutes and appoints Robert Palmese and his successors, acting as hereinafter provided, as his or her Representative, attorney-in-fact and agent, with full power of substitution and re-substitution to act in his or her name, place and stead in connection with the authority granted to such Sellers Representative pursuant to this <u>Section 11.21.</u>  Each Seller acknowledges that such appointment is coupled with an interest and shall survive the death, incompetency, bankruptcy or liquidation of such Seller.  By executing this Agreement under the heading "Sellers Representative," Robert Palmese hereby (i) accepts his appointment and authorization to act as Sellers Representative and agent, proxy and attorney-in-fact on behalf of the Sellers in accordance with the terms of this Agreement, and (ii) agrees to perform his obligations under in good faith, and otherwise comply with, this <u>Section 11.21</u>.

(b)     Except as otherwise set forth in this <u>Section 11.21</u>, all the statements, directions, action or other communications made by the Sellers Representative are binding on each of the Sellers as if such Seller had made the statement, direction, action or other communication itself.

(c)     The Sellers Representative is granted the authority to take all actions he believes necessary or appropriate under this Agreement, including interpreting all of the terms and provisions of this Agreement, authorizing payments to be made with respect hereto and thereto, determining and settling all payment obligations pursuant to this Agreement, determining the allocation of proceeds pursuant to this Agreement, consenting to, compromising or settling all claims, conducting negotiations with Buyer, Parent and their respective agents regarding such claims, and engaging counsel, accountants or other Representatives in connection with the foregoing. Without limiting the foregoing, each Seller by such appointment.

(i)     authorizes the Sellers Representative to act as the sole point of contact between the Buyer and the Sellers, to take any and all actions required or permitted to be taken by the Sellers Representative under or in connection with this Agreement and to do all things and execute any and all documents which may be necessary, convenient or appropriate to facilitate the consummation of the transactions contemplated by this Agreement, and for the following additional purposes:  (A) to give and receive notices and communications to or from the

Buyer relating to this Agreement and the Transaction Documents and the other transactions contemplated by this Agreement and the Transaction Documents; (B) to act on such Seller's behalf with respect to the matters set forth in Section 2.3, in accordance with the terms and provisions of Section 2.3, including giving and receiving all notices and communications to be given or received with respect to the matters set forth in Section 2.3 and disputing the matters in Section 2.3; (C) on behalf of the Sellers, to initiate or to refrain from initiating or to dispute or to refrain from disputing any indemnity or other claim under this Agreement and the Transaction Documents, as the Sellers Representative, in its reasonable discretion, determines to be necessary or desirable; (D) on behalf of the Sellers, to negotiate, compromise and resolve any dispute which may arise under this Agreement or the Transaction Documents, as the Sellers Representative, in its reasonable discretion, determines to be necessary or desirable; (E) on behalf of the Sellers, to exercise or refrain from exercising remedies available under this Agreement and the Transaction Documents and to sign any release or other document with respect to such dispute or remedy, as the Sellers Representative, in its reasonable discretion, determines to be necessary or desirable; (F) to execute and deliver waivers and consents in connection with this Agreement and the Transaction Documents as the Sellers Representative, in its reasonable discretion, determines to be necessary or desirable; (G) to act on such Seller's behalf with respect to the matters set forth in Section 6.18; (H) to take any actions allowed under Article X, in Sellers Representative's sole discretion; and (I) to take all actions necessary or appropriate in the reasonable discretion of the Sellers Representative for the accomplishment of the foregoing, in each case without having to seek or obtain the consent of any Seller and

(ii) agrees to be bound by all agreements and determinations made by and documents executed and delivered by the Sellers Representative pursuant to the authority granted to it hereunder. Notwithstanding anything to the contrary set forth in this Section 11.21, the Sellers Representative shall not have authority to take actions on behalf of a Seller with respect to any portion of a claim brought by a Buyer Indemnified Party directly against a Seller.

(d) The Sellers Representative (i) shall not be liable for any actions taken or omitted to be taken in good faith under or in connection with this Agreement, the Transaction Documents or the transactions contemplated hereby or thereby and (ii) shall not owe or have any fiduciary duty or fiduciary responsibility to any Seller as a result of any action taken by the Sellers Representative pursuant to this Agreement, except for any such action taken or omitted to be taken resulting from the Sellers Representative's willful misconduct.

(e) Each Seller through the execution of this Agreement expressly acknowledges and agrees that the Sellers Representative is authorized to act on his or her behalf, notwithstanding any dispute or disagreement between any Seller and the Sellers Representative, and each indemnified Party under this Agreement and any other Person shall be entitled to rely on any and all actions taken by the Sellers Representative under this Agreement without any liability to, or obligation to inquire of, any of the Sellers.

(f)     Any notice or communication given or received by, and any decision, action, failure to act within a designated period of time, agreement, consent, settlement, resolution or instruction of, the Sellers Representative that is within the scope of the Sellers Representative's authority under this Section 11.21 shall constitute a notice or communication to or by, or a decision, action, failure to act within a designated period of time, agreement, consent, settlement, resolution or instruction of all the Sellers and shall be final, binding and conclusive upon each such Seller.  Each indemnified Party under this Agreement and any other Person shall be entitled to rely upon any such notice, communication, decision, action, failure to act within a designated period of time, agreement, consent, settlement, resolution or instruction as being a notice or communication to or by, or a decision, action, failure to act within a designated period of time, agreement, consent, settlement, resolution or instruction of, each and every such Seller.

(g)     The authorizations of the Sellers Representative shall be effective until its rights and obligations under this Agreement terminate by virtue of the termination of any and all obligations of the Sellers Representative and the Buyer under this Agreement.

(h)     The Buyer may rely upon the authority of the Sellers Representative to act as the agent of the Sellers.

(i)     The Sellers shall, jointly and severally, indemnify the Sellers Representative for, and hold the Sellers Representative harmless against, any Loss, liability or expense incurred on the part of the Sellers Representative, arising out of or in connection with the Sellers Representative's carrying out its duties under this Agreement or any Transaction Document, including costs and expenses of successfully defending the Sellers Representative against any claim or liability in respect thereof.  The Sellers Representative may consult with counsel of its own choice and as to any claims brought by the Sellers against the Seller Representative.  The Sellers Representative will have full and complete authorization and protection for any action taken and suffered by it in good faith and in accordance with the opinion of such counsel.

Section 11.22. Dispute Resolution.  Supplementing Section 11.7, and without limiting the rights of an aggrieved party under Section 11.16, the Parties agree that any controversy or claim arising out of or relating to this Agreement or its formation, interpretation or breach, shall be resolved by arbitration administered and held in accordance with the then International Arbitration Rules of the International Centre for Dispute Resolution (the "*ICDR Rules*"; see: www.adr.org).  The arbitration shall be conducted in the English language in New York County, New York, U.S.A., by three neutral arbitrators, appointed in accordance with the ICDR Rules. The award shall be in the English language.  The arbitrators shall decide the dispute in accordance with the laws of the State of New York, USA, applicable to agreements executed and to be fully performed in such state (choice of law rules that might cause the application of the laws of any other jurisdiction shall not apply).  The award of the arbitrators shall be final, shall not be subject to appeal or review, and may be entered in any court of competent jurisdiction anywhere in the world.  If a party shall breach or threaten to breach the confidentiality provisions of Section 11.16 of this Agreement, the aggrieved party may seek and obtain temporary restraining orders, injunctions, or other equitable relief from any court having jurisdiction

without first proceeding to arbitration, or from the ICDR or the arbitrators, and in any such proceeding may proceed without posting a bond, surety or proving actual damages. If a party fails to pay its allotted arbitrators' fees or ICDR fees and fails to cure the same within 20 calendar days from receipt of notice of default in payment, then the claim or defense of such party shall be struck and cancelled and the arbitrators shall hear and determine the dispute based upon the non-defaulting party's submissions and thereafter issue an award in favor of the party that is not in default in such payments. The Parties understand and agree that by agreeing to arbitrate disputes, controversies and claims that they are waiving the right to trial by jury and trial before a judge and any right to appeal the decision, award and determinations of the arbitrators.

**[*Signature Page Follows*]**

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by each Party as of the date first above written.

INTERNATIONAL ENERGY HOLDING LLC

BY: _____
　　　　Robert Palmese, CEO


BUYER

GQA HOLDINGS LLC,

BY: _____



FLOWER POWER, INC.

BY: _____



FLOWER POWER CO. LTD.

BY: _____

SELLERS:

_____
ROBERT PALMESE
Individually and as Sellers Representative

Address:

8070 Narrows Avenue, Brooklyn, NY 11209

_____
CHRISTINA PALMESE-ROOSEN
By: Robert Palmese, attorney in fact

Address:

11 Fifth Avenue, 17L, New York, NY 10003

_____
RONALD PALMESE, JR.
By: Robert Palmese, attorney in fact

Address

11 Fifth Avenue, 16L, New York, NY 10003

_____
STEPHEN PALMESE
 By: Robert Palmese, attorney in fact

Address:

49 West 12 Street, 4A, New York, NY 10011

PALMCO

PALMCO ADMINISTRATION, LLC

BY: _____
           Robert Palmese, CEO

Address:

C/O Robert Palmese
 8070 Narrows Avenue, Brooklyn, NY 11209

FAMILY ENERGY G.K.

BY: _____
           Robert Palmese, CEO

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by each Party as of the date first above written.

INTERNATIONAL ENERGY HOLDING LLC

BY: _____
      Robert Palmese, CEO

BUYER

GQA HOLDINGS LLC,

BY: _____

FLOWER POWER, INC

BY: _____

FLOWER POWER CO. LTD.

BY: _____